

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-11-00122-CV**

IN THE INTEREST OF S.G.
AND S.J.G.

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant A.G. (Father) appeals the termination of his parental rights to his children S.G. and S.J.G. We will affirm.

**Background Facts**

Father is the biological father of S.G., who was six years old at the time of trial, and S.J.G., who was almost three years old. The mother of the children is Father's former girlfriend (Mother), who had two older children from an earlier relationship. The Department of Family and Protective Services (the

---

[1]*See* Tex. R. App. P. 47.4.

Department) was notified in April 2010, of alleged abuse of the four children by Mother.[2] At the time, Father was incarcerated for assaulting Mother.

Child Protective Services (CPS) investigator Lishawa Jackson interviewed the children. S.G. told her that they were being spanked with hangers and that the children had to sleep in the garage because Mother was running a massage business out of the house. M.G., the children's nine year old half-brother, told Jackson that when it was hot, they would plug in a fan, and when it was cold they would plug in a heater. When the garage got too hot, the children would put ice bags on the bed to cool it off. When Mother had a client, the children had to wait outside for eight minutes before they were allowed to come in. Other women worked with Mother out of the house, and the bedrooms were numbered "One," "Two," and "Three." S.G. told Jackson that sometimes he would stay home alone with S.J.G., his then two year old sister. Jackson also interviewed Mother at the home. Mother denied that the children slept in the garage, or had to use a fan or ice packs on beds in the garage, although she did acknowledge that the children

---

[2]The April 2010 investigation was the fifth investigation of Mother and the fourth of Father. The Department was first notified of Mother and her two older children in 2002, before Father's two children were born. The Department was notified again in 2004, regarding a mark on one of the children's backs and on one of their lips. That investigation was ruled unable to determine. The third investigation was also in 2004 regarding improper feeding. In July 2008, the Department was notified again because "there was no food in the home, the family was borrowing electricity from a neighbor, [and] it was cluttered, it smelled, [and there were] dirty clothes all over the home." The investigation was ruled reason to believe.

would plug in an electric heater in the winter. M.G. also confirmed that Mother spanked them with a hanger, which Mother did not deny.

The CPS investigation also revealed ads Mother had posted on websites advertising her services with pictures of her in lingerie. While Jackson was at the home interviewing Mother, the police arrived to arrest Mother on outstanding warrants. When the police told Mother that they suspected she was engaging in prostitution out of her home, Mother replied that she "had to do what she had to do." Jackson visited Father in jail and asked him if he had concerns about Mother's prostitution. He said he did, "but what [could he] do about it, [he was] in jail."

In April 2010, the Department took the children into its care and filed for termination. They were put in a foster home because there was no suitable family placement. The court ordered the parents to complete CPS-designed service plans.

After a bench trial on March 14 and 15, 2011, the trial court found by clear and convincing evidence that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to

obtain the return of the children, and that termination was in the best interest of the children.[3]  Father now appeals.

## Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

---

[3]The trial court also terminated the parental rights of Mother and the biological father of Mother's two oldest children.  Neither Mother nor the other father are a party to this appeal.

4

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001 (West Supp. 2011), 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

**Discussion**

**I. Legal and Factual Sufficiency of the Evidence**

**A. Grounds for Termination**

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could

5

reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (E) or (O) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have

6

credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

In his first two points, Father argues that the evidence is legally and factually insufficient to support termination under subsections (E) and (O). *See* Tex. Fam. Code Ann. § 161.001(1)(E), (O). Subsection (O) provides for termination when a parent fails to comply with the provisions of a court order that specifically establishes the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. *See Id.* § 161.001(1)(O). Father was court ordered to, among other things,

(1) establish and maintain safe, stable, and appropriate housing for a period of at least six months;

(2) establish and maintain suitable employment for a period of at least six months;

(3) register with the Texas Workforce Commission within three work days of becoming unemployed;

(4) submit to a drug and alcohol assessment with Brief Therapy Institute and follow all recommendations from that assessment;

(5) attend weekly counseling sessions through Brief Therapy Institute and cooperate fully in all recommendations made through the counseling sessions;

(6) complete parenting classes with the Child and Family Guidance Center;

(7)   submit to drug testing;

(8) submit to a psychological evaluation and follow all recommendations from the evaluation; and

(9) have supervised visitation with the children once a week.

Father admitted at trial that he had been unemployed since he was released from jail.  He testified that he was hired for a position but was terminated the same day because he had a visitation with his children scheduled for that day.  He provided no documentation or witness to corroborate that testimony.  He said he was waiting until after trial to get a job.  He also admitted that he did not register with the Texas Workforce Commission.  Despite being unemployed, the testimony established that Father missed multiple visits with his children, which Father acknowledged.

Father also admitted that he never went to the required counseling sessions.  He testified that he tried, but the counselor was ill and the substitute counselor was booked.  Father never notified the Department of his problem or asked for their assistance, even though he had his caseworker's cell phone number at all times.  He testified that he could not go to another counselor because they were too far and he did not have a driver's license.  He blamed the "State of Texas" for his lack of license because the State would not waive tickets he had not paid.  Father claimed he was going to a private counselor, but he later explained that the doctor was just a psychiatrist who was monitoring Father's

8

medication. He also testified that he had requested an MHMR counselor while in jail but never saw one.

It is well settled that the family code does not provide for excuses for failure to complete court ordered services, nor does it consider "substantial compliance" to be the same as completion. *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting Texas courts have uniformly found substantial compliance with provisions of court order inadequate to avoid termination finding under subsection (O)); *In re T.N.F.*, 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pet. denied) (emphasizing that parents must comply with every requirement of the court order and that subsection (O) does not allow for consideration of excuses for noncompliance); *Wilson v. State*, 116 S.W.3d 923, 929 (Tex. App.—Dallas 2003, no pet.) ("Wilson's economic argument does not create a factual dispute as to her compliance: it is, instead, in the nature of an excuse for her failure to comply."). Rather, any excuse for failing to complete a family services plan goes only to the best interest determination. *See T.N.F.*, 205 S.W.3d at 631; *see also Holley v. Adams*, 544 S.W.2d 367, 371 (Tex.1976); *In re C.M.C.*, 273 S.W.3d 862, 874–75 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that mother's argument that she did not take a parenting class because none were available "[did] not create a factual dispute as to her compliance; rather, it is in the nature of an excuse for her failure to comply").

9

The evidence established that at the time of trial Father had not maintained employment, had not registered with the Texas Workforce Commission since his release from jail, did not consistently attend visitation with his children, and had not attended counseling sessions pursuant to the court order. We conclude that a reasonable factfinder could have formed a firm belief or conviction that Father failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of his children. We overrule Father's second point. Because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is necessary to support a judgment of termination, we need not address Father's first point. *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

### B. Best Interest

In his fifth point, Father challenges the legal and factual sufficiency of the evidence that termination is in the best interest of the children.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

10

(1)     the child's age and physical and mental vulnerabilities;

(2)     the frequency and nature of out-of-home placements;

(3)     the magnitude, frequency, and circumstances of the harm to the child;

(4)     whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5)     whether the child is fearful of living in or returning to the child's home;

(6)     the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)   the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)   the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)   whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

        (A)  minimally adequate health and nutritional care;

        (B)  care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley*, 544 S.W.2d at 371–72.

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

The Department investigator Jackson testified that all of the children who were of school age were behind in their education. She testified that neither Mother nor Father was maintaining contact with the children's school. The children were supposed to be receiving free lunches, but the paperwork had never been completed. The school reported that S.G. was doing well, but Father testified that he supervised the older children's homework and they were both two grade levels behind.

Father has been involved in four Department investigations since 2004. The CPS referral in 2008 was for the children wearing dirty clothes to school. When CPS investigated the house, there was no electricity and the house smelled. Father testified that it took two weeks to get the electricity back on.

Father has a long criminal history dating back to 1996, including convictions for possession of marijuana; possession of cocaine; possession of Xanax; and delivery of cocaine, for which he served thirteen months in the

13

penitentiary. Father also served two hundred days in jail for assaulting Mother. Mother had registered with the Victim Information and Notification Everyday (VINE) network to be notified when he was released. Father admitted that his criminal behavior was harmful to his children. But when he was asked whether anyone got hurt the night he assaulted Mother, Father said, "If you read the police report, there's no marks or no scratches or nothing on her . . . so I would say no one got hurt." In fact, Father claimed he was not guilty of the domestic violence charge but pleaded guilty because his court-appointed attorney was not helping him and in light of his previous felonies, one more misdemeanor "doesn't do anything for [him]."

When Mother described the assault at trial, she claimed that Father "lost his temper and he punched some holes around my head and kind of grabbed me by my throat." Father also destroyed Mother's cell phone that night because he found messages on it from another man. Mother walked to the police station and reported Father. S.G. witnessed the assault and confirmed Mother's story to the police. CPS investigator Jackson testified that it is harmful for children to witness domestic violence in their home and that children often mimic the behavior they learn from their parents. Father's mother (Grandmother) does not believe that Father hurt Mother in the assault. She also testified that there had been one other incident of family violence before.

Father was referred to Leticia Moreland for counseling. Father did not attempt to contact her for the first few months after his release from jail.

14

Moreland suffered an aneurysm in December 2010, and thereafter was unavailable. The Department caseworker Nikithia Thomas testified that if Father called Brief Therapy, they would have given him the name of another therapist in his area, but Father never attended any counseling. Father contacted the Child and Family Guidance Center about parenting classes but gave them his mother's phone number instead of his own. When they tried to return his call, they got no response. Thomas testified that in January of 2010, Father told her he had gotten a car and would be able to start doing his services. Yet Father did not complete his parenting class until nine days before trial in March 2011. Thomas testified that she gave Father her cell phone number in case he had any problems or questions, and he never called her to help with his services.

Jackson testified that she had concerns that Father knew about Mother's prostitution but did nothing to protect the children. Jackson testified that although Father was in jail, he could have called the 1-800 number for CPS and made a referral to protect his children. Father argues on appeal that he did not know that Mother was prostituting out of the children's home because he was in jail, but his testimony at trial was that as early as April 2009 he thought "she was doing more than just massage therapy" because she "started making a lot of money." Father also acknowledged that family members visited him while in jail and he did not ask them to report or investigate his concerns.

Thomas testified that she believed Father "was more concerned [with] what [Mother] was going to do and how she was going to act versus what he

needed to do to get his kids back." He would ask when Mother was visiting the children so that he could schedule his visits on the same day. Thomas also testified that "lately, he just hadn't been visiting at all."

Thomas testified that once when Father visited and had brought food for his two children, the other two children were present and "he actually was pretty good about having kids share the food." She testified that Father "would sit in a chair and tell the kids to bring him books or toys. When it was time to clean up, [Father] would sit in a chair and tell the kids to clean up. That was pretty much the extent of his interaction with the kids." She claimed that "he really didn't move, he didn't get on the floor and interact with the kids and play with the kids. It was more of, you know, I'm here, they're here, they see me, I see them. Okay, is my hour up yet? It's time to go." Thomas testified that she would offer him extra time with his children to make up for missed visits but he would tell her he had to leave. She described one visit when she offered him extra time and his mother, who had driven Father to the visit, encouraged him to stay but he still insisted on leaving. Although the children enjoyed their visits with Father, this evidence is marginally relevant at best because of their young age. *See In re S.N.*, 272 S.W.3d 45, 51–52 (Tex. App.—Waco 2008, no pet.) ("[I]t is doubtful that such evidence is indicative of the [child]'s conscious, volitional desire to maintain a parent-child relationship or to permanently sever that relationship.").

The CASA caseworker supervisor Kristen James also testified that Father did not always show up for his visitation. She stated that Father did not hold the

16

kids and that Grandmother "did more interacting with the kids than he did." She said that when the children would bring him books, "[h]e wouldn't read through the book, [he'd] look through the book with the child. I wasn't sure if he could read or not." She also testified that she never heard Father say he wanted the kids to be with him.

James testified that she had concerns about Father because "he needed to address his anger issues and domestic violence, and that wasn't even touched on" in the services he completed. She also testified that Father never told her he wanted the children in his care but that "it was always that they should be with their mom and not with him." Thomas believed that Father, by not doing his services, had failed to alleviate the risk of abuse or neglect to the children. She did not believe it was in the children's best interest to be returned to their parents. *See In re T.M.J.*, 315 S.W.3d 271, 278–79 (Tex. App.—Beaumont 2010, no pet.) (holding the evidence legally and factually sufficient to support finding that termination was in the best interest of the children when, among other things, mother failed to complete her service plan, and her counselor believed that mother expressed little concern about the children, lacked interest in them, and lacked motivation to help herself or the children).

Mother testified that Father took the children "to the park, Chuck E. Cheese, to his mom's house, pretty much anywhere the kids wanted to go." Father's aunt testified that Father always fed the children "nourishing foods." She testified that he took the children to school and to play in the park and "took

17

care of them like a father should." Father testified that he took the kids to play at the park and the pool and played video games with them. He also testified that he took the children to the doctor and the dentist and the hospital when they were sick late at night. Yet he could not recall the name of the children's pediatrician. At the family group conference in August 2010, Father expressed concerns that the children were not being taken care of in their foster home and that he was not being updated on the status of his case while incarcerated. Father never made any child support payments because he was not court ordered to do so and because he "figured y'all [the Department] were taking care of them." Grandmother testified that she wanted S.G. and S.J.G. to live with her and Father. Neither Grandmother nor Father's aunt felt they could care for the children on their own if Father's parental rights were terminated.

As noted above, Father's excuses are also considered in a best interest determination. *See T.N.F.*, 205 S.W.3d at 631; *see also Holley*, 544 S.W.2d at 371; *C.M.C.*, 273 S.W.3d at 874–75. Father argues that his "recent turnaround" is evidence that it is in the children's best interest to stay with him. He points to his completion of the parenting class and that he was looking for work. However, Father testified at trial that he was waiting until trial was over to start a job. Father completed his parenting class only nine days before trial, despite being out of jail for five months. Despite having no job and admittedly not looking for one during the trial, Father still did not show up to trial until the second day because he "was never sent anything that [he] was supposed to be [there]." This

18

is not evidence of a "turnaround." *See In re C.C.*, No. 13-07-00541-CV, 2009 WL 866822, at *11 (Tex. App.—Corpus Christi Apr. 2, 2009, no pet.) (mem. op.) (holding that mother had not made a turnaround when "the undisputed evidence showed that she had failed to alleviate the main concern underlying the children's removal").

Considering the relevant statutory factors in evaluating Father's willingness and ability to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision, his willingness to effect positive environmental and personal changes within a reasonable period of time, and the other relevant *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, the trial court could reasonably have formed a firm belief or conviction that termination of Father's parental rights to the children is in the children's best interests. Accordingly, the evidence is legally and factually sufficient to support the trial court's family code section 161.001(2) best interest finding. We overrule Father's fifth point.

## II. Due Process and Family Reunification Services

In Father's third point, he argues that his right to due process was violated by the State's failure to timely communicate the results of his drug and alcohol assessment and his psychological evaluation. He argues that without the results, he was unaware of the specific actions he was required to take to obtain the

return of his children.[4]  In his fourth point, Father argues that the Department failed to provide sufficient family reunification services as required by the family code.  Section 263.102(e) of the family code states,

> Regardless of whether the goal stated in a child's service plan as required under Subsection (a)(5) is to return the child to the child's parents or to terminate parental rights and place the child for adoption, the department shall concurrently provide to the child and the child's family, as applicable:
>
> (1)   time-limited family reunification services as defined by 42 U.S.C. Section 629a for a period not to exceed the period within which the court must render a final order in or dismiss the suit affecting the parent-child relationship with respect to the child as provided by Subchapter E . . . .

Tex. Fam. Code Ann. § 263.102(e) (West 2008).

Father argues that because he did not receive the results of his drug and alcohol assessment and his psychological evaluation (including any further steps he was required to complete based on the results of the evaluations), the Department failed to provide sufficient family reunification services as required by the statute.

---

[4]Father relies on *In re B.L.R.P.*, 269 S.W.3d 707 (Tex. App.—Amarillo 2008, no pet.).  That case held that because there was no court order specifically establishing the necessary actions the parent needed to take to obtain the return of his child, Father's parental rights could not be terminated under subsection (O). *Id.* at 711.  In this case, there was a court order. *B.L.R.P.* is thus inapposite here.

Even if Father should have received the results of his drug and alcohol assessment and his psychological evaluation, he has suffered no harm because he failed to complete a number of other specific actions listed in his service plan, including maintaining employment, registering with the Texas Workforce Commission, visiting with his children as ordered, and attending counseling sessions. *See* Tex. R. App. P. 44.1(a)(1) (requiring that an error complained of cannot be reversed on appeal unless it is shown to have probably caused the rendition of an improper judgment). That is, even if he had received the results of his assessments and completed any recommendations, he still would have failed to meet the other requirements for the return of his children. We overrule Father's third and fourth points.

**Conclusion**

Having overruled all of Father's points on appeal, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL: LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED: November 10, 2011

21