

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-10-00439-CV**


IN THE INTEREST OF P.R.R.,
THE CHILD


----------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant W.R. (Father) appeals the termination of his parental rights to his child, P.R.R. We will affirm.

### I. Background Facts

P.R.R. was born in 2005, to Father and P.H. (Mother).[2] At the time, Father was married to M.R. (Ex-Wife), with whom he has two older children. He began

---

[1]*See* Tex. R. App. P. 47.4.

[2]Mother's rights were terminated in 2007. She is not a party to this appeal.

dating his current girlfriend (Girlfriend) when P.R.R. was six months old. P.R.R. refers to Girlfriend as her mother.

P.R.R. was first removed from Mother and Father in June 2006, because Child Protective Services (CPS) "kept getting reports in regards to [Mother and Father] fighting over child custody, fighting over child support nonpayment, [and] leaving . . . the child at [Father's] place of employment." Mother had repeatedly left P.R.R. in the bushes around Father's salon. In June, Mother left P.R.R. at a fire station, and Father was called to retrieve her. A few days later, Mother had P.R.R. again, went to CPS, and told a supervisor, "I can't take it anymore, I can't—I can't handle the child, I can't get any support, and so I need to . . . have a break." Mother claimed that Father had refused to help pay for P.R.R.'s food, diapers, or child care because he was not sure he was the father. CPS did not place P.R.R. with Father because he was denying paternity and because CPS had concerns regarding domestic violence and drug use. Mother stated that she could not leave P.R.R. at Father's mother's house because the grandmother had stated "that [she was] going to do something to that baby."

P.R.R. was taken into custody and placed in foster care. Because of concerns that Father had not made necessary changes despite completing his services, CPS filed to terminate Father's parental rights. A bench trial was held in December 2007, and P.R.R. was returned to Father.

In October 2009, The Colony police department received several anonymous tips that Father was selling marijuana at the barber shop where he

2

worked. Father's name was also linked to two other drug investigations in the city. Officer Richard Torres set up surveillance at the salon for two months and observed Father getting in to various vehicles for a few minutes and then getting out and going back into the salon. Officer Torres also obtained the trash from Father's home and found remnants of marijuana, seeds, and stems, as well as tobacco that had been taken out of cigars.

Because of Father's criminal history, the police obtained a no-knock search warrant, which was executed on October 22, 2009, at 9:00 a.m. Officer Torres testified that the house smelled of marijuana and that he believed that Father and Girlfriend were under the influence of marijuana. In the master bedroom closet, police found a nine millimeter handgun in a jacket pocket and an ammunition clip inside a shoe on the floor. Police also found a double-edged knife with brass knuckles laying on the mantel in the living room. This type of weapon is illegal in Texas. Officers found marijuana "blunts" and ashes on a dresser in the master bedroom, in a purse in the closet, under the bed, around the family computer in the living area, and inside a "marijuana grinder" that was also in the living room. They found a glass pipe, scales, and bottles of prescription medicines, some of which were not prescribed to anyone in the house. Father had a stash of marijuana hidden in the attic. Inside Father's truck, officers found marijuana ashes on the floorboard, and Officer Torres described the odor of marijuana coming from the truck's ashtray. Father admitted to selling drugs and stated that he began doing so when Girlfriend lost her job.

P.R.R. was again taken into CPS custody and placed in foster care. She was moved twice and was finally placed with the owner of the salon where Father worked, E.P. Father was given a CPS service plan, which he completed. Girlfriend was also required to do services, which she completed as well. However, CPS and CASA were still dissatisfied with Father's results and felt that he did not make the necessary changes to create a safe home for P.R.R. CPS filed again to terminate Father's parental rights.

After a three-day trial in October 2010, a jury returned a verdict finding that Father engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of P.R.R. and that termination was in P.R.R.'s best interest. This appeal followed.

## II. Standard of Review

In Father's two issues on appeal, he challenges the legal and factual sufficiency of the jury's finding that termination was in P.R.R.'s best interest.

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18,

4

20 (Tex. 1985). We strictly scrutinize termination proceedings in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id*. § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have

5

done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573—574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and

6

permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

8

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### III.  The Evidence at Trial

### A. Father's previous involvement with CPS

Before the October 2010 trial, Father had experienced the complete process of having his child removed, performing services pursuant to a service plan, and participating in a trial in which CPS was seeking to terminate his parental rights. In arriving at the disposition of the first case, CPS, service providers, and ultimately a trial court had to consider the issues as they existed in 2007, and evaluate Father's efforts and credibility. P.R.R. was in foster care for about two years during the first case. *See* Tex. Fam. Code Ann. § 263.307(b)(2)–(4). The evidence in the second trial reflected that in 2007, Father had a lengthy criminal history, drug addiction problems, and displayed resistance to accepting responsibility for his actions, as well as an inability to understand the

9

true impact that his choices had on the physical safety and emotional security of his child. *See id*. § 263.307(b)(1).

Father testified that he had called CPS on Mother in the first case because she had threatened to let P.R.R. starve. He admitted that there were times when Mother would come to him for money and he would turn her away. CPS received multiple reports concerning both Mother and Father, and eventually Mother took P.R.R. to CPS and said that she could not handle the situation and needed a break.

Michelle Hiza investigated the first CPS case. She noted that Mother's other children "talked about . . . violence, talked about the drug abuse, that [Father] would do in front of them. They described exactly how to roll the drugs, that they smelled different from cigarettes." Mother told Hiza that she had once gone to the hospital because of Father's domestic violence. Mother also claimed that Father would smoke marijuana while driving with P.R.R. and another child of Mother's in the car.

Father was convicted in 2004, of a lesser-included misdemeanor offense of assault for attempting to run over Mother with his car. When Hiza questioned Father about this charge, Father laughed. Father denied hitting Mother with his car and claimed that Mother was attacking him and he defended himself. Hiza believed that Father did not have "any concern for the bigger picture about the child's safety." Hiza questioned Father about his drug habit, and at first he denied smoking marijuana for years, but he admitted to it once she asked him to

10

take a drug test. He also denied selling drugs at that time, claiming that it was in his past and that Mother was lying.

Hiza testified that Father never accepted responsibility for the danger he put P.R.R. in and that he blamed Mother for breaking up his marriage to Ex-Wife despite the fact that he was cheating on Ex-Wife with Mother and did not tell Mother that he was married. Hiza felt that Father was not always interested in P.R.R., but along with Mother, seemed to use the child as an excuse to act badly in their relationship. Hiza testified that she was "not surprised" when she found out that Father was arrested in 2009, for selling drugs because "you have to take that responsibility for your actions, and he . . . wouldn't even acknowledge a lot of things."

Dr. Catherine Bass, Father's psychologist, also testified that Father "took no responsibility" for CPS's involvement in the first case but blamed Mother. She had concerns that he did not acknowledge his role in the first case "[b]ecause if you don't feel like you've done anything wrong, it's hard to make changes."

CPS legal liaisons supervisor Cassidy Baker testified that the decision to proceed to termination was difficult in the first case because Father had completed his services but that the feedback from service providers was that "he didn't really seem to be adopting those changes that—that we needed to see. And there was a concern . . . that he may revert back to his previous behavior." Baker testified that Father told everyone in the first case, including the trial judge, through his testimony, that he had quit drugs and would not put P.R.R. through

11

this again. Father prevailed in his first termination trial. Baker testified that the judge in Father's first case told Father that she wanted to give him a chance but that he was on thin ice.

## B. Father's second termination trial

### 1. Father's substance abuse and criminal history

Father has been incarcerated eleven times, including multiple charges of possession of marijuana and cocaine. *See id*. § 263.307(b)(7,8). Father had spent time in both TDCJ and county jails. He was convicted of assault family violence on both Mother and Ex-Wife. One of Father's drug convictions was for a prohibited substance in a correctional facility. He was also convicted for interfering with an emergency call by Ex-Wife.

Janie Zygiel, who completed Father's drug assessment, said that Father had a troublesome history with drugs, dating back to the age of fourteen or fifteen. She said that Father's level of addiction was something that could be with him for the rest of his life. Father reported to her that he smoked marijuana every day before work and that his last use was the day that the police arrested him in October 2009. Zygiel also testified that Father did not express regret for selling marijuana. On a scale of one to ten in terms of drug abuse severity, Zygiel ranked Father an "8-plus" and stated that Father's level of chemical dependence would present a "significant" impact on his ability to parent. Zygiel questioned Father's ability to provide a safe environment for P.R.R. and to have proper judgment in guiding her and providing for her needs, and she felt that

Father would need "pretty intensive intervention" if Father was going to change. She also testified that Girlfriend had a dependence on marijuana and that it would be difficult for two people who live together to recover unless both were committed. Zygiel testified that if Father had really been committed to staying off drugs, he should have been going to AA or NA meetings every day at the beginning of his sobriety. However, she also stated that staying clean for a year is "an indication that [Father has] been really willing to do some work, and do what it takes to show up and take care of stuff."

Father's chemical dependence assessment rated him as having a high probability of a substance use disorder. It stated, "The level of defensiveness . . . along with moderate admissions of substance use . . . and elevated level of subtle addictive attributes is indicative of addiction." The report also noted that "he may exhibit limited insight into his substance use patterns if addiction exists." The report also noted, however, that Father "reported that the best things to ever happen to him include the birth of his kids . . . and he stated that they are his reason to keep going and give them a better life." Hiza testified that marijuana users are very difficult to work with in substance abuse treatment because they do not view the drug as inhibiting their ability to parent.

Dr. Bass performed a psychological evaluation on Father. She testified that in his first session, Father stated that he felt that his marijuana use was "justified" because of his arthritis and that he did not believe it impaired his parenting abilities. Dr. Bass was concerned about this because "marijuana has

some documented [effects] on functioning in terms of motivation and reaction speed and . . . judgment." In his second session, however, Father told Dr. Bass that he had stopped smoking marijuana, and she felt that he was genuine in his intent to quit. However, Dr. Bass also testified that she still had some doubts that he would be able to follow through.

Dr. Bass also testified that Father does not feel like using and selling marijuana is wrong except for the fact that it is illegal. Father reported "quite a bit" of Vicodin use for his arthritis. Dr. Bass did not believe that Father acknowledged that he had a problem with drugs. She noted in her report, "The fact that [Father] had illegal drugs in his home even after his daughter had previously been removed for 1 ½ years for the same offense speaks to the difficulty he will have in maintaining a drug-free home."

Father admitted to selling drugs and that he began when Girlfriend lost her job. Although Girlfriend lost her job again in 2010, Father testified that he has not gone back to selling drugs, but instead he started working two more days a week. Father testified, "I believe using marijuana is wrong and it is illegal. Using marijuana gets you in a lot of trouble, gets you put in jail, make[s] you lazy, and it—I guess it endanger[s] your child, like they said. If somebody tried to steal marijuana from you, of sorts, so I know it's a dangerous drug." He testified that he has been going to AA and NA meetings and has had a sponsor for five months. He has taken four or five drug tests since the start of this case and has passed all of them except for the first one. He testified that he now chooses his

14

friends more wisely, but he also admitted that he is still working at the same salon where he was caught selling drugs.

Although the pictures the police took during their raid show marijuana ashes all over the house, Father denies that he left drugs around his house. He suggested that the police officers put the drugs there before they took the pictures. He also denied that his house smelled like marijuana or that he was high at the time of the search, contrary to Officer Torres's testimony. Father testified that he did not smoke marijuana until P.R.R. had gone to school and before he went to work.

Father testified that since he has been off drugs, he started going to the emergency room for his arthritis. When that got too expensive, he found a doctor who prescribed him Vicodin for the pain. He takes three Vicodin a day, and he acknowledged that it too is an addictive drug. Father never discussed his drug history with his doctor, however, despite the fact that Dr. Bass recommended that he needs to inform his doctors of his drug history.

At trial, Father denied that his reactions were slower when he was on marijuana and stated that he believed he could act at the same speed he could when he was not on drugs. Father testified that he never saw harmful effects of drugs on his girlfriend.

CASA supervisor Lori Powell testified that she has "not seen that [Father] has acknowledged that using drugs or selling drugs, outside of the fact of being caught and having his daughter removed as a result of it, was detrimental to her

15

well-being, and her safety." CASA's concern is that Father would revert to his illegal behavior if he felt like he could get away with it. She said that had Father shown that he understood the significance of the risk he placed P.R.R. in, she would have felt satisfied that Father had changed. She does not believe that Father understands the difference between loving and caring for P.R.R. and putting her needs before his.

The reports from First Step Counseling for Father's drug and alcohol education and treatment reported that Father was receptive, attentive, alert, accepting, sincere, calm, open, and responsible, and noted a positive response to treatment. First Step rated him as having a low probability for dependency. However, Father denied ever feeling bad or guilty about drug use and denied neglecting his family because of drug use.

Father admitted that when he was selling and using marijuana, he was thinking about himself, not P.R.R. He testified, "I will work 80 hours a week, seven days a week, so I won't have to go back to using or selling drugs. I will work. I will get a second job, if I have to."

Father testified that he is sincere in his promise to quit drugs because when he saw "the expression of [his] child's face, and when she told [him] the woman had told her [that P.R.R. would not get to go back to Father] and, the look on her face, [he would] never sell drugs or use drugs again." He said,

> I will not put my daughter in this predicament never again in life, not even myself in this predicament in life no more. I can't go back to jail. I have to work my services. I know it's a lifetime commitment,

16

you know, one day at time. You know, that's why I go to NA, and I talk to my peers, and I talk to my sponsors, and I'm getting help. From inside, I know it's not an easy thing to do. I know it's not. And that's why I have to keep on working my steps. And I'm going to continue to work my steps for me and my child, and my whole family.

## 2. Psychiatric, psychological, and developmental evaluations

Zygiel said that Father seemed to be open and honest with her. *See id*. § 263.307(b)(6). She stated that Father would look like a loving Father when he spoke of P.R.R. and that he seemed to miss her. While Father acknowledged that selling marijuana resulted in his child being placed in foster care again in October 2009, he never expressed any regret to Zygiel.

Dr. Bass described Father as "[v]ery pleasant, friendly, easy to work with." He took the initiative to call and schedule appointments with her, and she found him to be open and involved in the process. She noted that he had a stable job for the past eight or nine years and good relationships with his other children, Ex-Wife, and Girlfriend. Dr. Bass's report noted that he was "polite, personable[,] and cooperated fully." She noted that he "takes no responsibility for the first CPS case, but said that 'This time it's my fault. I was arrested. My drugs. No excuse.'" Father told Dr. Bass that the first CPS case was a vendetta by Mother because Father had broken up with her.

Dr. Bass noted that Father had "intense" deficits in his reading skills and that he struggled with tests that required a fifth-grade reading level. She testified that his testing revealed that "he appeared to deny some problems that he did

have" and that he attempted through his answers to appear like a "more well-adjusted person" than he really was.

Dr. Bass diagnosed him with antisocial personality disorder, which she described as "not conforming to social norms, repeatedly breaking laws, impulsivity, failure to plan ahead, reckless disregard for the safety of self or others, consistent irresponsibility, including failure to provide consistent income or honor financial obligations, lack of remorse, [and] indifference of rationalizing behavior that has hurt others." Although she noted that Father felt remorse for his acts, she also felt that he rationalized his behavior. For instance, Father "justified having an illegal weapon in his house by saying it was 'for decoration only.'" She noted that Father "displays some passivity in not creating a new, legal way to ensure his family's survival." She testified that it was likely that a person with antisocial personality disorder would continue the same behavior in the future because such well-engrained behavior requires "quite a bit of effort" to change. Based on her testing and interactions with Father, Dr. Bass believed that P.R.R. was "clearly neglected." She testified, "Illegal activities were going on in the home. He was using substances that could affect his functioning as a parent, so I considered that neglect."

### 3. Father's willingness to complete services

It is undisputed that Father immediately began participating in services and that he completed the services. *See id*. § 263.307(b)(10).

18

Powell testified,

> [I]n talking to his service providers, initially, especially with his counseling, there was still a lot of resistance. In talking with [Father], observing him in the visits, CASA's conclusion is that [Father] has continued throughout this case to make excuses for the behaviors that brought [P.R.R.]—not only that brought [P.R.R.] into care this time, but also in previous cases, as well as his criminal history. And those causes—that causes CASA concern about what real change he's made.

The progress reports submitted by his therapist, Dr. Michele Greer, noted that Father was making progress towards his therapy goals every month. Dr. Greer reported that Father "seems motivated to make changes. He expresses remorse for his actions and is discussing his responsibility in the removal." Dr. Bass testified that it bodes well that Father completed all his services but that it was not a good sign that he has had to go through services twice.

### 4. Father's ability to effect positive change

Powell testified that CASA's recommendation was to terminate Father's rights. She said, "CASA just doesn't feel that it's—that [P.R.R.] should be placed at risk to determine at this time, [if Father] has really made the changes that he has said over and over he has made in the past." *See id*. § 263.307(b)(11). Powell expressed concern that Father continues to pose a threat of harm to P.R.R. because "when he admits to doing wrong, it's in conjunction with because I was arrested. And he sees his arrest as what hurt [P.R.R.], as opposed to his drug use, and his selling of drugs itself, being dangerous to [P.R.R.]. And he's continued that, throughout the case." She testified that a few weeks before trial,

19

Father sometimes denied selling drugs, then admitted to selling them, but excused his actions because of his arthritis.

The primary CPS caseworker, Ashton Moore, did not believe that Father was "cursed from the get-go" because of any predisposition against him. She noted that the first caseworker in the current case was optimistic that Father would succeed this time. She was able to give him some service providers with whom he had worked before, and in that way she felt that Father had a "head start." Moore said that she has no doubt that Father loves P.R.R., but she does have concerns regarding his intent to stay off drugs. She said, "That concern is based on statements he's made to his providers and throughout the case, that more or less, he's sorry he got caught. Marijuana is illegal, as opposed to marijuana is harmful." Dr. Bass noted that Father "does not see the problem with [marijuana] . . . , aside from the fact that it's illegal." Father denied all symptoms of substance abuse "aside from the fact that it has gotten him into trouble now."

Father read a letter he wrote to the jury, which said, in part,

> [T]o think about my daughter being out of my life, my heart stops beating, and my mind goes blank and bad thoughts, like her being hurt and screaming out my name. Something that a father can't even imagine, feeling helpless.
>
> At night, I can't sleep. I toss and I turn, thinking about the safety of my child, thinking about her being with a family, that haven't got caught with their demons in life and my child being a victim.
>
> Being her father, I can't . . . imagine not living with her, knowing that I have a child in foster, in the system. And she's thinking, where's my father, and I'm thinking, where can I find her?

And she's thinking that she's not getting the same love that her sister or brother are getting. Every time I go places, her sister and brother be asking, where's [P.R.R.]? Is she coming?

If I—if I knew that my past was going to haunt me, then I wish I could turn back the hands of time. I rather have a love of my kids, than to have no love at all. Not just the one child is getting hurt, but a whole family, a whole family that loves her dearly and strong.

I'm a father that has no bad intentions. I work six days a week. I've been on the same job for ten years. I've been a counselor, a friend, and even a father to others. I had my mother move to a different spot, so that I could make a fresh start in life. I went back to school so I wouldn't have to go back and do the same things I did in the past.

I still have a problem with smoking marijuana for my arthritis, but I have medical help now . . . so that – now that, if I think about relapse, I'm going to have peers to talk to. And the thought of relapsing, it haven't even crossed my mind, when I think about my child and what she's going through in life being without her family.

## 5. Father's parenting skills

Father testified that he was a loving parent who helped raise his nieces and nephews before he had children of his own. *See id*. § 263.307(b)(12). He said that his children are happy and healthy and feel loved and safe in his home. Girlfriend testified that one of the reasons she fell for Father was that "[h]is dedication to his children was amazing" and that she had "never seen a better dad." She says that Father loves his children, spends a lot of time with them, and takes care of them. Father testified that P.R.R. was on insurance through the welfare office before and that if she were returned, he would get the insurance reinstated. Father testified that he would "absolutely" be willing to pay for counseling and to have P.R.R. tested for ADHD.

21

Father leaves work every day to pick up his older children from school and brings them back to the salon until their mother gets off work. One of Father's coworkers also testified that Father left every day to get his children from school. He also testified that he never saw Father lose his temper with the children.

Father testified that he has a good relationship with his older children and Ex-Wife. He helps pay some of Ex-Wife's bills, and he sees his other kids every weekend. He testified that he buys them clothes and supplies for school and that on Fridays he gives each child a dollar for ice cream.

He testified that he developed a bond with P.R.R. "when she first came into this world" and that he has taken care of her "from day one." He described their typical day starting with bathing P.R.R., brushing her hair for school, and eating breakfast. Girlfriend picked P.R.R. up from school while Father worked until 7:00 p.m. After work, Father would rent a movie to take home and watch with the family. He testified that he never hits P.R.R. but gives her time out instead. Although he believes that P.R.R. is safe and happy with her foster family, he testified that she wants to come home.

Father testified that the only time P.R.R. was not safe in his home was the day the police searched the house. He then agreed that she was not safe during the time he was selling drugs. He said, "She was safe with me, but I did not know that she wouldn't be—by me putting drugs in the attic and me—well, when I was smoking marijuana, she was not safe, apparently." Girlfriend also testified that when they were doing drugs, they had no idea that it was dangerous to

22

P.R.R. She said that they would not return to drugs because "throughout this process, I realize that people are watching, obviously. They kicked down the door. And I realized that people are watching." She said that she wanted to teach P.R.R. not to do drugs because "[s]omebody is watching, you [are] going to get caught at some point in your life."

Dr. Bass testified that Father "seemed to really care about his daughter" and that "he did express disappointment" that his actions caused P.R.R. to be in foster care again. She believes that Father "wants to be a good father" and "is concerned with [the children's] lives and he wants to be a part of their lives." She said that Father's face brightened when he talked about P.R.R., that he had pictures of the children on his phone, and that he "seemed genuinely to care about his children." Her impression was that "he does love them, . . . but I don't know about his understanding of prioritizing. I feel that he does meet his own needs before his children's."

Father testified, "I don't—really don't understand what, like, priority means. I just know about love, what it—what it takes to love—love a child." Father testified that he learned a lot in his parenting class and was able to describe at trial what to do when a child misbehaves. He said his instructor this time "really took her time, time with me, and—and explained to me, and sat down to me, and really gave me the definition of being a parent. And I appreciate that, really appreciate her for that." Father testified that he was not able to understand the

effects of his behavior on P.R.R. the first time because she was so young and unable to express herself. Father said,

> My daughter is bigger now. She could talk. She could tell me what's wrong with her, tell me how she feels. And to sit up here telling me that, Daddy, every time I see her, I'm ready to come home, when am I coming home? Daddy, this woman say that I'm not going to be able to see y'all no more, and her bawling down crying. No, I can't handle it no more, no.

He explained that he thought his parenting duties were over when P.R.R. went to bed, but he now knows that he is parenting even when P.R.R. is sleeping or at school. When asked why it took him so long to learn these lessons, Father said, "I'm a slow learner. And it takes a lot to get—get through to me, but I realized for my child point of view and mine, that it is unacceptable. And that I have to do what I have to do to keep my child safe at all times." Powell, the CASA casework supervisor, testified however that she did not see any change in Father's behavior during visitation in terms of engaging, disciplining, or bonding with P.R.R.

### 6. Visitation

Powell said that Father was not engaged in his visitation with P.R.R. She testified that Father answered phone calls during the hour-long visit and would sometimes text on his phone "for quite a bit of time." Although she did not doubt that Father loves P.R.R., she "would expect a father to be more involved."

Powell testified that Father very regularly showed up late to his visitation. The visitation logs show that Father was late to fourteen visits, and for eight of

those he was ten minutes late or more. The visitation log also shows that Father and Girlfriend chose to leave fifteen minutes early during one visit in May. Powell said that Father would sometimes not show up to visitation, even after confirming, and that when he did that, there was not time to prepare P.R.R. for not seeing her dad. Powell testified that Girlfriend was the primary disciplinarian but that neither Father nor Girlfriend would follow through on disciplining P.R.R. when she misbehaved during visitation. Father would bring breakfast for P.R.R. and they would talk over their meal, and he occasionally read to her and rocked in the rocking chair.

Powell testified that at the first visitation, P.R.R. "very shyly went over to [Girlfriend] and hugged her, but did not greet [Father] in any way, either verbally or physically go over to him and had to be encouraged by [Girlfriend] to do so." She also stated that P.R.R.'s lack of interaction with Father continued throughout the year and that P.R.R. "very often, ran over or greeted [Girlfriend], but did not go to [Father]. And without encouragement from [Girlfriend], [Father] didn't initiate any kind of contact either."

Moore, the primary caseworker for CPS, also testified that P.R.R. appeared more bonded with Girlfriend than with Father, and that Father would frequently leave during visitation. She said that Father would sit in a chair close to the door and "would just usually sit back and lean back and observe [Girlfriend], interacting with [P.R.R.]." Moore said that sometimes Father would go out to his truck for a few minutes and return. Moore testified that CPS has

25

rules that do not allow parents to leave in the middle of visitation, that she spoke to Father about his violating the rules, and that he continued to do so. P.R.R. did not notice that Father left the visits because she was busy playing with Girlfriend.

Dr. Lori Pettaway, a CASA volunteer, was assigned to Father's case but was later removed for failing to follow CASA protocol. She testified that when P.R.R. would see Father, "she would run to the door, run outside to greet him, hug him, kiss him, and start talking. Just talking, talking, talking." She said she observed Father playing with P.R.R. and that he appeared attentive and communicative. Pettaway said that she originally did not have a good feeling about this case but now believed that P.R.R. should return to Father. Pettaway admitted that she never spoke to any of Father's service providers or visited his home. She testified that Moore told her that Father "got" them in the first case, but it "was not going to happen this way this time." Although Pettaway testified at trial that she believes that P.R.R. should be returned to Father, Powell testified that a month before trial, Pettaway "clearly stated" that P.R.R. should remain in foster care. Powell said that Pettaway complained of Father's behavior during phone calls they had and expressed concerns about whether Father had truly made the changes which he had espoused. Powell testified that before Pettaway was removed from the case, Pettaway's opinion was that Father's parental rights should be terminated.

### 7. Support System

26

Father and Girlfriend have lived in their current house for about four years. *See id*. § 263.307(b)(13). Father testified that they have been behind on some bills during the past year. Father has been working at the salon for ten years. E.P., the salon owner and P.R.R.'s current foster father, described him as a dependable employee. E.P. testified that he spoke with Father when P.R.R. was taken away and said that Father was going to give up his parental rights and that it was E.P. who convinced him to fight for her.

E.P. testified that he had no concerns that Father would start using drugs again, but he also testified that he had never known Father to smoke marijuana previously and that he did not know that Father had been selling drugs outside of his salon. He believed that it is in the best interest of P.R.R. to be with her parents. CPS's legal liaisons supervisor Baker testified that there were a lot of people at the family group conference supporting Father and Girlfriend.

### 8. CPS's plan for P.R.R.

E.P. testified that he was not planning on adopting P.R.R. *See Holley*, 544 S.W.2d at 371–72 (considering the agency's plans for the child and the stability of the proposed placement). Moore testified that she performed a "legal risk broadcast," where she looks for prospective adoptive families for P.R.R., and got over twenty responsive families. Moore testified that her first choice for a placement for P.R.R.

> is a two-parent family, that's also African-American. They adopted a four-year-old child three years ago . . . through CPS, so they

27

understand what behaviors go along with children who have been in the system.

> In that family—the father in that family is a pastor. He also does a lot of other work around the community. The mother is not a stay-at-home mother. I can't recall exactly what her employment is, but I know she has experience in the education field.

> They were more than comfortable with [P.R.R.]'s behaviors at school and they were able to handle those. Their jobs also allowed for them to be at school with [P.R.R.] if she needed them there, if she got in trouble for some reason and had to be sent home.

> They understand counseling. They are more than willing to go to counseling with [P.R.R.] in order to get her in her home. And if we would have moved [P.R.R.] prior to this hearing, they were more than willing to drive [P.R.R.] to visits with her father since they were court-ordered.

Moore also said that the prospective family would be willing to set up a post office box so that P.R.R.'s biological family could write to her. Based on the legal risk broadcast, Moore has no doubt that CPS will find an adoptive home for P.R.R.

Baker testified that if Father's rights were terminated, P.R.R. would get a subsidy of up to $400 per month, Medicaid until she was eighteen years old, and in-state tuition waivers for college.

## IV. Discussion

Father argues that the evidence is legally and factually insufficient because it is "undisputed" that there was no neglect or abuse of P.R.R., that he loved P.R.R., and that he was willing to complete his services and stay off drugs. We disagree with Father that it was undisputed that P.R.R. was neglected. Dr. Bass

testified that Father's drug habit and the threat of violence that accompanies selling drugs clearly impeded Father's duty to care for P.R.R.

Father has been diagnosed with antisocial personality disorder, and he rationalized his behavior instead of taking responsibility for the choices he made. He has a long criminal history with multiple charges of possession of marijuana. Father admitted that he had promised to stay off drugs before and that he had failed to do so. Although he claims to have made significant strides in keeping off drugs, he still works in the same salon where he was selling drugs at the beginning of this case. There was evidence that Father has not been proactive in finding alternative, legal ways to support his family. *See In re T.M.J.*, 315 S.W.3d 271, 278–79 (Tex. App.—Beaumont 2010, no pet.) (holding the evidence legally and factually sufficient to support best interest finding when, among other things, mother's counselor believed that mother expressed little concern about her children, lacked interest in them, and lacked motivation to help herself or her children).

There was evidence that Father had significant chemical dependence that would be hard to overcome. Testimony that Father does not understand the damaging effects on P.R.R. of smoking and selling marijuana beyond its illegality was supported by Father's own testimony that he believed that P.R.R. was safe in his house except for the day the police came. *See In re C.C.*, No. 13-07-00541-CV, 2009 WL 866822, at *11 (Tex. App.—Corpus Christi Apr. 2, 2009, no pet.) (mem. op.) (holding that record did not support mother's characterization of

a recent turnaround when "the undisputed evidence showed that she had failed to alleviate the main concern underlying the children's removal"). A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.); *see also Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). The jury was free to disbelieve Father's testimony that he would stay off of drugs as he had promised and failed to do before.

Father argues that the Department's lack of a plan for P.R.R. is at least as detrimental to P.R.R. as returning her to Father. However, the Department's evidence showed that they had an adoption plan for P.R.R. with a family who would be able to care for P.R.R.'s physical, emotional, and psychological needs. Under Father's care, P.R.R. has spent more of her life in foster care than out of it. Father was repeatedly late to his weekly hour-long visits with P.R.R., and spent much of that time on the phone, not engaged with P.R.R. Although Father completed his services and claims to have learned much through his services, there was evidence that Father made no change in his behavior during visitation. Further, "evidence of improved conduct, especially of short-duration, does not

conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

The jury in this case had the benefit of hindsight. Father completed his services in his first case and expressed the same love for his child and plans for her future to the trier of fact at that time. The service providers and CPS workers in that case testified to their serious concerns about Father's ability to follow through. The evidence in the second trial proved those concerns to have been prophetic. The jury in the second case had sufficient evidence to conclude that it would not be in the best interest of P.R.R. to be exposed to Father's choices yet again. Based on the evidence presented at trial and considering the relevant statutory and *Holley* factors, we hold that, in light of the entire record, the jury could have reasonably formed a firm conviction or belief that Father would not be able to maintain a safe and drug-free home for P.R.R. and that termination of Father's parental rights as to P.R.R. was in P.R.R.'s best interest. Accordingly, the evidence in the record is both legally and factually sufficient to support the jury's best interest finding. We overrule both of Father's issues.

## V. Conclusion

Because we overruled all of Father's issues on appeal, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: GARDNER, McCOY, and GABRIEL, JJ.

GARDNER, J., dissents without opinion.

DELIVERED: January 26, 2012