315 S.W.3d 271 (2010)
In the Interest of T.M.J. and X.K.J.
No. 09-08-00310-CV.
Court of Appeals of Texas, Beaumont.
Submitted May 5, 2010.
Decided June 24, 2010.
*272 Anita Provo, Beaumont, for appellant.
Tom Maness, Crim. Dist. Atty., Eric S.A. Houghton, Asst. Crim. Dist. Atty., Beaumont, Gerry Williams, TDFPS General Counsel, Trevor A. Woodruff, TDFPS, Appellate Atty., Austin, for appellee.
Before McKEITHEN, C.J., KREGER and HORTON, JJ.

OPINION
STEVE McKEITHEN, Chief Justice.
C.L.H. appeals the termination of her parental rights to the minor children T.M.J. and X.K.J. C.L.H. raises two issues for our consideration. In her first issue, C.L.H. argues that the evidence was legally and factually insufficient to support the jury's finding that termination was in the best interest of the children. In her second issue, C.L.H. asserts that the jury charge was overly broad, thereby violating her "constitutional rights to due process and the Fourteenth Amendment." We affirm the trial court's judgment.

THE EVIDENCE
C.L.H. testified that Child Protective Services ("CPS") became involved with *273 T.M.J. and X.K.J. in November of 2005, when T.M.J. was found outside while C.L.H. was asleep inside her apartment. According to C.L.H., the door was locked, and T.M.J. "woke up and unlocked the door herself." C.L.H. testified that CPS removed the children from her home on December 15, 2006. C.L.H. testified that on that date, when she arrived home, the CPS caseworkers were standing outside, and she saw her husband, R.H., "yelling upstairs to one of the neighbors[.]" C.L.H. found out that her neighbor "had called the police on my children because I was inside asleep. The children were outside playing, and I was nowhere to be found, apparently."
According to C.L.H., when CPS removed the children, she, her husband, and the children were living in a one-bedroom apartment.[1] C.L.H. and her husband slept on one side of the room in a full-size bed, and T.M.J. and X.K.J. shared a twin-size bed. C.L.H. denied having sex with her husband while the children were in the room. C.L.H. testified that on one occasion, her husband came after her with a knife, but she did not characterize their relationship as abusive. C.L.H. opined that her husband has an anger problem "[w]hen he is upset."
C.L.H. testified that after CPS took the children, the trial court instructed her to work with CPS and follow a service plan, and she was asked to complete parenting classes, attend counseling, attend Alcoholics Anonymous meetings, and visit with the children twice per month. C.L.H. explained that she has not seen T.M.J. and X.K.J. for approximately a year because her husband was coming to the visits, and C.L.H. was told that if her husband continued to attend, the visits would be suspended based upon the recommendations of C.L.H.'s counselor and psychiatrist. C.L.H. testified that she continued to allow her husband to attend the visits; her husband caused a disturbance at some of the visits; and her visits with the children were ultimately suspended.
C.L.H. testified that she was unable to provide CPS with names of relatives who could care for the children because her family members had health issues and legal problems. C.L.H. explained that she began seeing a counselor, but her counselor ultimately suspended her sessions because "I was not writing as often as I should to my children." C.L.H. testified that she did not attend any Alcoholics Anonymous meetings, but she attended some domestic violence support group meetings. C.L.H. admitted she told her counselor that if she were CPS, she would not give her kids back to herself "[b]ecause at that time I could not provide a stable environment." However, C.L.H. testified that "since that last counseling session[,] I am now at a stable job, I have [a] stable residence, and I feel I can offer more to my kids than I could before." C.L.H. testified that she completed her parenting class, but that she did not maintain written contact with her children or follow through with her twelve-step program. In addition, C.L.H. testified that although CPS had instructed her and her husband to go to marriage counseling, they did not do so due to conflicting work schedules. According to C.L.H., she successfully completed only two of the thirteen tasks in the family service plan, although she felt that the tasks she was asked to do were reasonable.
C.L.H. testified that she has three children, and the oldest child, H.P., lives with *274 her biological father.[2] H.P. lived with C.L.H. for about one year, and H.P. went to live with her father after CPS became involved and removed her from C.L.H.'s home. C.L.H. testified that although she is permitted to have supervised visitation with H.P., she has not seen H.P. "in maybe a couple of years because I haven't had transportation.... And also I have to work in order to take care of household bills."
C.L.H. testified that she had engaged in a sexual relationship with her current stepfather. In addition, C.L.H. testified that on one occasion, she accepted money from her stepfather for engaging in sexual activity with him. C.L.H. explained that she had considered divorcing her husband, but although she did not feel that her relationship with her husband created a good environment for her children, she no longer intends to seek a divorce. C.L.H. testified that she would "just like to see [the children] back home with me because I feel that would make me happier." When C.L.H. was asked whether she felt that it was in the children's best interest to be in the home with her and her husband, C.L.H. testified, "[s]omewhat." After the State and the guardian ad litem rested, C.L.H. returned to the stand and testified, "I'd still like to see my kids home and happy." C.L.H. explained that during a recess in the trial earlier that day, she decided to divorce R.H. When asked whether she agreed that termination was in her children's best interest, C.L.H. responded, "[s]ort of."
Officer Donald James English, Jr. of the Beaumont Police Department testified that on June 4, 2006, he responded to C.L.H.'s complaint about being threatened with a knife by R.H. during an argument. Officer English explained that he arrested R.H. "due to future threat of family violence," and R.H. was also charged with aggravated assault with a deadly weapon and interference with a 911 call.
Pamela Morris of CPS testified that she investigated the case concerning C.L.H.'s oldest child, H.P. Morris explained that she received referrals from five different individuals concerning H.P., and she merged all of the referrals into one investigation. Morris testified that she was "investigating allegations of sexual abuse, neglectful supervision[,] and physical neglect." Morris testified that she ruled out those allegations, but she testified that "although I did not find any abuse, there was a high probability of risk. And at that time it was felt due to [C.L.H.] being a new, inexperienced mom, there were just some concerns." Morris explained that she referred the case for family safety services, which involves someone from CPS going into the home and working with the parent. According to Morris, she received additional referrals concerning possible physical neglect and neglectful supervision of H.P. the following year, and Morris found that physical neglect and neglectful supervision existed. Morris testified that C.L.H. admitted to using marijuana, as well as to having multiple sexual partners. In addition, Morris explained that "[t]he home environment was a hazard. There was old food in the kitchen area, there was old food with maggots on the counter. There were numerous used condoms on the floor in the bedroom, just the whole house was unkempt. In the bathroom were towels that had feces smeared on them." At the conclusion of the investigation, H.P. was living with her paternal grandmother and her father pursuant to a voluntary placement. Morris explained that she has not been involved *275 with the case concerning T.M.J. and X.K.J.
Michelle Oldbury, an investigator with CPS, testified that she investigated referrals involving T.M.J. and X.K.J. According to Oldbury, after the initial referral in December of 2006, her investigation revealed that C.L.H. "had a nighttime job and she was sleeping during the day. The children were being left unsupervised during the day to kind of [fend] for themselves. They got out of the home unsupervised in the apartment complex on several different occasions." Oldbury explained that a few days later, CPS received a referral concerning similar allegations of neglectful supervision, and CPS merged the referrals into one investigation. According to Oldbury, on one occasion when the children were outside unsupervised, T.M.J. had on only a t-shirt and no underclothes or pants. Oldbury testified that one of the referrals indicated that the three and four-year-old children were unsupervised at three o'clock a.m. On one of the occasions when the children were found outside, law enforcement officers had to awaken C.L.H., and when the officers told C.L.H. that the children were outside unattended, she said "okay" and went back to sleep.
Oldbury explained that she removed T.M.J. and X.K.J. in December of 2006. On the day Oldbury removed the children, C.L.H. was not at home when Oldbury arrived, but C.L.H.'s husband, R.H., was with X.K.J. at the apartment. Oldbury testified that she waited for C.L.H. on the road by the car. Oldbury explained that she saw R.H.
walk out of the apartment complex, leave the door open. I think he had garbage in his hand. He went to the back of the building and he came back around a couple of minutes later.... [T]hen he saw a friend upstairs and he walked up the stairs and started engaging in a conversation with him, all the while the door was left open in the apartment complex and I was observing the front door and I am assuming that [X.K.J.] stayed asleep on the couch, but never went and checked on him. And then [R.H.] came down the stairs after that and another woman walked across the apartment complex and he started engaging in ... [a] verbal altercation with her using foul language, and I called the police at that point to come out.
Oldbury explained that the apartment was small, so the couch on which X.K.J. was sleeping was "right there by the door[.]" C.L.H. eventually arrived with T.M.J., and Oldbury testified that C.L.H. admitted that the children were left unattended because she worked nights and did not have anyone to watch the children during the day while she slept.
According to Oldbury, C.L.H. violated the safety plan that CPS had previously put into place by being alone with T.M.J. without supervision. Oldbury testified that she decided to remove the children based upon C.L.H.'s extensive history with CPS, R.H.'s lack of protectiveness toward the children, the children being left unattended, and C.L.H.'s inability to find a voluntary placement for the children. Oldbury testified that she also considered C.L.H.'s history with CPS concerning H.P. According to Oldbury, there had been previous allegations that the children were eating from garbage cans and that C.L.H. was having sex in front of them, but Oldbury was not involved with investigating those allegations.
Jimmy LaComb, a licensed professional counselor, testified that he counseled C.L.H. individually pursuant to a contract with CPS. LaComb testified that C.L.H. discussed R.H.'s anger problem during *276 counseling, and that LaComb advised her to check into a women and children's shelter, but C.L.H. did not do so. C.L.H. told LaComb that her relationship with R.H. had been physically abusive in the past, but that the abuse was "mainly verbal now." According to LaComb, when he was counseling C.L.H., C.L.H. was not having any contact with the children, yet LaComb had told C.L.H. to maintain contact as much as she could by writing letters. LaComb testified that C.L.H. always had an excuse for not writing to the children. LaComb stated that C.L.H. expressed little concern about the children, and LaComb felt that C.L.H.'s priorities were her work and her husband. LaComb explained that he warned C.L.H. that he would terminate their counseling sessions if she did not write to her children, and that he eventually terminated her sessions when she failed to do so. LaComb explained that at the request of the CPS caseworker, he reopened C.L.H.'s case and began counseling C.L.H. again in October of 2007. LaComb explained that he felt that C.L.H. had not made any efforts to extricate herself from her abusive relationship with R.H. LaComb opined that R.H. was not a safe person to have around children. LaComb explained that he believed C.L.H. was in an abusive cycle with her husband, and that she lacked interest in the children.
LaComb stated that C.L.H. also told him she had engaged in sexual relations with her current stepfather twenty to thirty times, and that she accepted money from him for sex on one occasion. LaComb also testified that C.L.H. did not complete the assigned parenting classes, and that C.L.H. had lied to her caseworker about attending a domestic violence support group. According to LaComb, he decided to terminate C.L.H.'s sessions again after C.L.H. told him that if she were a judge, she would not return the children to herself. LaComb explained that he believed he did everything he could to help C.L.H., but C.L.H. lacked the motivation to help herself or the children. When asked whether it is in the best interest of the children to live with C.L.H., LaComb answered, "[n]ot at all."
Laura Rennick, the manager of the apartment complex where C.L.H. lived with the children, testified that she observed the children unattended at the apartment complex approximately twice per week during the ten months that C.L.H. lived there. Rennick explained that she also received reports two to three times per week that the children were outside unattended. Rennick testified that on one occasion, T.M.J. was naked except for a t-shirt. Rennick described the children as "[v]ery dirty, snotty noses, the little boy's diapers would be so full of urine that it [sic] would be hanging on his legs." According to Rennick, the carpet in C.L.H.'s apartment was stained, the apartment smelled bad, diapers were lying around, food was left out, and the unit was not well maintained. Rennick also testified that the power company turned off C.L.H.'s electricity at least three times. Rennick explained that each apartment has a bolt lock on the door, as well as a chain that is high enough that a child could not reach it. In addition, Rennick opined that R.H. had an anger problem.
Danni Craig, associate president of the Church of Jesus Christ of Latter Day Saints, testified that C.L.H. is a member of the church. According to Craig, the church assisted C.L.H. with rent and food. Craig testified that the president of the church recommended marriage counseling, but C.L.H. did not follow the president's recommendation. Craig opined that C.L.H. loves her children and tries to be a good parent, but needs to learn some parenting skills. In addition, Craig opined *277 that "until [C.L.H.] gets the education she needs and learns what she needs to that the children are safer [in foster care]."
Debbie Dronett Lee, a supervisor for CPS's foster care unit, testified that at the fifth-month permanency conference, CPS changed its plan from family reunification to termination due to "[l]ack of participation in services by the parents." Lee explained that C.L.H. was unable to provide the names of any relatives who could adopt the children. CPS created a family service plan, pursuant to which C.L.H. was to visit the children, maintain contact with the children by writing to them, attend individual counseling sessions, attend a twelve-step program, obtain a psychological evaluation and follow all of the recommendations, assess community resources for domestic violence, and obtain marriage counseling; however, she failed to complete these tasks.
Lee opined that C.L.H. has not made the necessary efforts to show that she can provide a safe environment for the children. In addition, Lee testified that CPS has given C.L.H. multiple chances, and has "provided all the services that are necessary if a person has a commitment to getting [her] children back." According to Lee, there are potential adoptive parents for the children, and Lee opined that termination of C.L.H.'s parental rights would be in the children's best interest. Lee testified that "permanency is what the children need, what they deserve at this age. And the only way to achieve that is through adoption and that requires termination."
Kim Williams, a supervisor with Court Appointed Special Advocates ("CASA"), testified that CASA's role is to perform an independent investigation and make a recommendation to the trial court as to what is in the best interest of the children. Williams testified that although T.M.J. initially acted out sexually and X.K.J. did not talk, the children are thriving in their current placement. Williams opined that T.M.J.'s behaviors indicate that "[s]he has either been exposed [in] some form or fashion to sexual abuse or seen some sort of sex acts." Williams explained that CASA recommended termination of C.L.H.'s parental rights and adoption.

ISSUE ONE
In her first issue, C.L.H. argues that the evidence is legally and factually insufficient to support the jury's finding that termination of the parent-child relationship is in the best interest of the children.[3] Because involuntary termination of parental rights implicates fundamental constitutional rights and is both severe and permanent, the burden of proof at trial is clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2009); *278 Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). "`Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2008). Before parental rights may be involuntarily terminated, the trier of fact must find by clear and convincing evidence (1) that the parent committed one of the statutory grounds found in section 161.001(1) of the Family Code, and (2) that termination is in the children's best interest. TEX. FAM.CODE ANN. § 161.001; see also Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987).
In a legal sufficiency review, we consider all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction about the truth of the matter on which CPS bears the burden of proof. In re J.L., 163 S.W.3d 79, 84-85 (Tex.2005). We assume the factfinder resolved any disputed facts in favor of its finding, if a reasonable factfinder could do so, and disregarded all evidence that a reasonable factfinder could have disbelieved. In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002). In a factual sufficiency review, we give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. Id. (citing In re C.H., 89 S.W.3d 17, 25 (Tex.2002)). We consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. Id. The evidence is factually insufficient if the disputed evidence is so significant that a factfinder could not have reasonably formed a firm belief or conviction. Id.
In determining whether termination is in a child's best interest, the Supreme Court has set forth a non-exhaustive list of several factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.1976). The party seeking termination need not prove that each Holley factor favors termination. In re C.H., 89 S.W.3d at 27. The same evidence of acts or omissions used under section 161.001(1) may be probative in determining the best interest of the child. In re A.A.A., 265 S.W.3d 507, 516 (Tex.App.-Houston [1st Dist.] 2008, pet. denied).
The factfinder heard evidence that T.M.J. and X.K.J. were outside unsupervised at C.L.H.'s apartment complex on multiple occasions, sometimes in the middle of the night and partially nude. The factfinder also heard evidence that the children were very dirty, and that X.K.J.'s diapers were heavily soiled. The record also indicates that of thirteen requirements contained in the family service plan created by CPS, C.L.H. completed only two. In addition, the record contains evidence that C.L.H.'s husband, R.H., was verbally and sometimes physically abusive. The record also contains evidence that C.L.H.'s counselor believed C.L.H. expressed little concern about the children, lacked interest in them, lacked motivation to help herself or the children, and that at *279 one time, C.L.H. expressed the belief that the children should not be returned to her. The record also contains evidence that the children are thriving in their current placement, and that a potential adoptive family for them exists. Furthermore, the record contained evidence that C.L.H. had not seen T.M.J. and X.K.J. for approximately one year before trial.
C.L.H. testified that she now has a stable job and a stable residence, and that she can now offer more to her children. C.L.H. also testified that she would like to have the children back home with her. In addition, C.L.H. expressed the intention to divorce R.H. The record also contained evidence that C.L.H. loves her children and tries to be a good parent.
On this record, applying the appropriate standards of review, including the Holley factors, we hold that the evidence was legally and factually sufficient for a reasonable factfinder to form a firm belief or conviction that it was in the best interest of the children for C.L.H.'s parental rights to be terminated. Accordingly, we overrule issue one.

ISSUE TWO
In her second issue, C.L.H. argues that the jury charge was overly broad, thereby violating her "constitutional rights to due process and the Fourteenth Amendment." At the charge conference, C.L.H.'s counsel stated that he had no objections to the charge. Therefore, C.L.H. waived her constitutional complaint concerning the jury charge by failing to raise it in the trial court. See In re B.L.D., 113 S.W.3d 340, 351, 354-55 (Tex.2003); see also TEX.R.APP. P. 33.1(a). Accordingly, we overrule issue two and affirm the trial court's judgment.
AFFIRMED.
NOTES
[1] C.L.H.'s husband is not the biological father of T.M.J. or X.K.J. The children's biological fathers no longer have parental rights to T.M.J. and X.K.J.
[2] C.L.H.'s parental rights to H.P. are not at issue in this proceeding.
[3] CPS argues we are precluded from addressing C.L.H.'s issues because she did not include them in her statement of points on appeal. See TEX. FAM.CODE ANN. § 263.405(i) (Vernon 2008). However, the Texas Supreme Court has "held that section 263.405(i) is unconstitutional `when it precludes a parent from raising a meritorious complaint about the sufficiency of the evidence supporting the termination order.'" In re G.K., No. 09-08-00506-CV, 2009 WL 2616926, at *2 (Tex. App.-Beaumont Aug. 27, 2009, no pet.) (mem. op.) (quoting In re J.O.A., 283 S.W.3d 336, 339 (Tex.2009)). Therefore, we will consider C.L.H.'s issue concerning the sufficiency of the evidence regarding best interest. In addition, with respect to C.L.H.'s constitutional issue concerning the broad form jury charge, C.L.H. included in her statement of "possible points of error for appellate review" contentions that the charge did not support the termination order. Liberally construing C.L.H.'s points, as we must, we conclude the points are adequate to preserve her jury charge complaint. See In re B.L.R.P., 269 S.W.3d 707, 710 (Tex.App.-Amarillo 2008, no pet.).