02-11-289-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00289-CV

 

 


 
 
 In the Interest of J.C.P. and M.E.S., ChildreN
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

 

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          

I.  Introduction

          In
two issues, Appellant Father appeals the trial court’s termination of his
parental rights to J.C.P. and M.E.S., arguing that there is no evidence or
insufficient evidence to support the trial court’s finding that he did not
respond by filing an admission of paternity and that there is no evidence or
insufficient evidence to support the trial court’s finding that termination was
in the children’s best interest.  We will affirm.

II.  Factual
and Procedural Background

          The
children involved in this appeal are J.C.P., a male child who was born on October
19, 2006, and M.E.S., a female child who was born on March 16, 2009.  Because
only Father has appealed and because he does not challenge the endangerment
grounds, the following testimony from the June 27, 2011 termination trial will
focus on the evidence relevant to the best interest factors.

A. 
CPS Investigator’s Testimony

1. 
Domestic Violence and Drug Use

          Wanesta
Corretjer, an investigator with Child Protective Services (hereinafter referred
to as CPS or the Department), testified that a referral was received on July
15, 2010, regarding domestic violence that had occurred two days prior when
Father had allegedly lunged at Mother with a kitchen knife and  had threatened
to kill her.  Mother ran out of the house in a t-shirt and panties and reported
that she was afraid and that the domestic violence was ongoing. 

          Due
to the report of the knife, Corretjer took the police with her when she went to
visit the home on July 19.  When Corretjer talked to Mother alone, she did not
deny the knife incident but minimized it by stating that Father merely had a
knife in his hand.  Mother said that the children were safe and that there was
no abuse or domestic violence going on in the home.  Corretjer noted that Mother
had a bruise on her thigh, which she said had occurred when she bumped into a
washing machine.  Mother did admit that Father had “busted her lip” with a
telephone on a prior occasion. 

          When
Corretjer interviewed Father by himself, he said that he understood how Mother
could have been intimidated by the knife but that it was not his intention to
scare her; he just picked it up during the argument.  Father said that he was
arguing with Mother over her not cleaning the home.  Father denied hitting Mother
any time recently, but he admitted that he had “smacked” her when she was
a teenager because she had allegedly cheated on him.[2]
 Father
also admitted that he had used marijuana since he was a teenager and had used
it the day before Corretjer interviewed him, said that he had used
methamphetamine the Friday before Corretjer interviewed him, but denied that he
had used it around the children.  Father told Corretjer that
he could not promise to abide by a safety plan.[3] 

2. 
Condition of Children

          Corretjer
testified that M.E.S. had one of the worst diaper rashes that Corretjer had
ever seen.[4]  Corretjer noted that
M.E.S.’s feet were dirty, that she came outside wearing only a diaper, and that
the parents never tried to get her to go back inside.  J.C.P. had discolored
teeth, a dirty face, dirty fingernails, dirty feet, and dirty toenails.  He was
still wearing a diaper at age four, and his diaper was soaked with urine.  After
J.C.P.’s feet were cleaned, unexplained marks were noticeable.  Both
children had what appeared to be insect bite marks on them. 

3. 
Condition of Home

          Corretjer
described the home as unsanitary and filthy.  The one bedroom in the duplex had
two twin beds in it, one of which was bare, and the other had a blanket on it.  The
bed that had no bedding on it had old food on it.  Corretjer recalled seeing a
crib that was piled with toys and that had a bottle with old formula in it;
there were roaches crawling on the bottle.  The high chair was very dirty, had
a roach in it, and contained old food and unknown substances.  The one bathroom
in the duplex had a toilet that was filled with feces and was not flushable, a
“very filthy” tub that had a film around the inside and along the walls, a
dirty sink, and dead roaches on the walls.  A water hose was strung across the
dining room and kitchen, but Corretjer did not know what it was being used for.
 The kitchen walls were dirty and had dead roaches on them.  The family had
adequate groceries in the refrigerator, but the refrigerator was not clean.  Mother
and Father said that they made their own cigarettes, and there was a photograph
depicting their tobacco. 

4. 
Removal of Children

          The
parents were not able to agree on a relative placement for the children, so
Corretjer took the children and placed them with a foster family. 

B. 
CPS Caseworker’s Testimony

          Tashani
Fernandes, a caseworker with CPS, testified that she had first contacted Father
in December 2010.  At that time, Father had already received a service plan
from a previous caseworker.

1.  Father’s
Compliance with Service Plan

          Father’s
service plan required him to complete a psychological evaluation, which he had completed;
to complete parent training, which he had not completed or initiated; to
complete anger management, which he had completed; to complete the Batterers’
Intervention and Prevention Program, which he was slated to start with Safe
Haven the month after the trial because Merit Family Services—the
initial provider—was never able to get in
contact with him; to complete individual counseling, which he had started but had
not completed; to complete couples counseling, which he had started but had not
completed; to complete a drug and alcohol assessment, which he had not
completed; to attend outpatient drug and alcohol treatment groups, which he had
not completed; to attend Narcotics Anonymous meetings, which he had not
completed;[5] and
to participate in random drug testing, for which he had submitted a urinalysis
on January 25, 2011, that tested positive for marijuana.[6]  Father
attended the visits,[7]
was appropriate with the children, and seemed to have a relationship with them.
 Fernandes testified that Father, who was the sole wage-earner in the family,
had told her that the services interfered with his job, and Fernandes told
Father to speak to the service providers and that they would accommodate his
work schedule.

2. 
Condition of Home

          Fernandes
made an unannounced visit to the home on December 17, 2010, and she found dead
roaches all over the inside of the refrigerator doors and on the back of the
refrigerator; there were small bugs crawling on the kitchen counters; there
were three beds in the sole bedroom; the bathroom was “really dirty” and had a
broken window; the window in the back door was broken; and there were holes in
the wall that looked like someone had punched the wall.  Fernandes testified
that there were concerns that J.C.P. had been exposed to lead poisoning, and
Fernandes talked to the parents about eliminating that issue.  The parents did
not indicate that they had taken any action or done anything to the house to
eliminate the possibility of lead poisoning.

3.  Condition
of Children at Termination Trial

          J.C.P.
was thriving in his foster home.  His foster parents were able to get him
potty-trained the month before the termination trial, he attended play therapy
weekly, his speech had improved, and he had gone from very quiet to very talkative
and outgoing.  M.E.S. had received occupational therapy and speech therapy when
she first came into care, but she was no longer receiving any therapy.  Neither
child had any medical conditions. 

4. 
CPS Requests Termination of Parental Rights

          Fernandes
did not believe that Father could provide for the emotional and physical needs
of the children.  Fernandes also did not believe that Father had the ability to
provide a safe and healthy environment for the children.  Fernandes believed
that it was in the children’s best interest for Father’s parental rights to be
terminated based on (1) the history of domestic violence, (2) Father’s failure
to address the domestic violence issues, and (3) the conditions of the home. Fernandes
testified that the foster parents were interested in adopting the children.

C. 
Mother’s Testimony

1.  Father’s
Criminal History and Drug Use

          Mother
said that Father had told her that he had been accused of rape in the past, but
the case was dismissed because of no evidence.  Mother said that Father used
marijuana occasionally.

2. 
Domestic Violence

          Mother
testified that Father had been violent toward her once “[y]ears ago” before she
had children.  Initially, Mother testified that she could not recall what had
happened, but later she testified that Father had pushed her in the chest because
they were “play-fighting.”  Mother said that she got mad and that they separated
for a couple of hours. 

          Mother
testified that Father had also accidentally hit her with a telephone. He threw
the phone, and she was supposed to catch it, but it hit her in the face. 

          Mother
testified that the police had been to her residence twice before the children
went into foster care.  The police came in 2008 in response to her mother’s
phone call that Father had spilled soup on Mother during an argument.[8]  Mother thought it
was an accident but was not sure.  Mother agreed that she and Father had a lot
of accidents. 

          The
second incident was the knife incident on July 13, 2010.  Mother initially
testified that she did not know why Father had a knife in his hand that day;
“[h]e just picked it up.”  Mother later admitted that she had said during her
psychological evaluation that Father was going to use the knife to cut his
marijuana.  Mother also admitted that she had been drinking alcohol and orange
juice that day, that she was tipsy, and that the children were asleep in the
other room when the knife incident occurred.  Mother testified that her mother had
forced her to write a false statement for the police that Father had chased her
with the knife, but she said that he had only pulled the knife on her.

          Mother
admitted that she and Father had a lot of arguments, including ones that
involved cursing, and that Father had yelled at her a lot.  Mother said that
the children were always in another room during the arguments and that she did
not think they yelled loud enough for the children to hear.  Mother said that
no arguing or yelling had happened recently; therefore, she did not think that
Father needed some type of domestic violence or batterers’ intervention
program.

3.  Condition
of Children

          Mother
testified that both children had a skin condition that caused their skin to
flake and turn into rashes.  Mother said that M.E.S. “had just gotten” the
diaper rash when she was removed and that Mother had a lotion for it.

          Mother
did not know until J.C.P. went into foster care that he had lead poisoning.  Mother
testified that they had purchased a lead test kit, that her dad had conducted
the test, and that there was no lead in the home.  Mother believed that
J.C.P.’s lead poisoning was from a toy that had been recalled in 2007. 

D. 
Father’s Testimony

1. 
Employment

          Father
testified that at the time of the termination trial, he was employed with
Accurate Metal Stamping; that he worked forty hours per week, Monday through
Thursday from 3:30 p.m. until 2:00 a.m.; that he made $9 an hour; and that he
had been employed at that job since December 2010 or January 2011.  Father was
previously employed with Big Joe’s, an Italian restaurant, where he had worked
seventy-two hours per week for two years.  While he worked there from 10:00
a.m. to 10:00 p.m., he said that it was “really difficult” to attend the
classes required under his service plan and that he was terminated from the job
in November 2010 after he missed a day of work to undergo his psychological
evaluation.

2. 
Criminal History and Drug Use

          Father
testified that the charges from the July 2010 incident were dropped.  Thus, his
only conviction was a 2006 conviction for possession of marijuana.

          Father
testified that he had last used methamphetamine two days before his children
were removed.  He had used methamphetamine more than just that time but did not
say how often he had used it; he testified that marijuana was his drug of
choice.  Father said that the allegations that he smoked marijuana every day
were not true.  Father stopped using all drugs after he tested positive for marijuana
in late January 2011.

          Father
thought that he was “perfectly fine” and did not need drug treatment at the
time of the termination trial but said that he probably had needed it in the
past.  Father agreed that people who smoke dope do not need to be parenting
their children and that he had smoked marijuana and had attempted to parent his
children.  Father testified that he had “quit everything” and was “trying to
continue to do right.”  Father agreed that, “[i]n a way,” he had not done
right. 

3. 
Domestic Violence

          Father
admitted that he had picked up a knife during the argument with Mother in July
2010, but he said that he did not pull it on Mother.  He said that he was using
a lot of marijuana at the time, that he was thinking like a drug addict, and
that he had picked up a knife to make a cigarette.  Father admitted that there
was a protective order in place after he went to jail for the knife incident.

          Father
thought that the soup incident was an accident because he did not recall being
angry and throwing soup at Mother.  He thought that “the information got mixed
up and made bigger.”

          Father
testified that the incident in which Mother was hit by the phone occurred
because Mother had slipped, and the side of the phone had hit her face; he was
not throwing the phone at her to hit her but rather he had intended for her to
catch it. 

          Father
admitted that he had committed violence against Mother when he first met her
because he “used to have a different mentality.”  Father said that he had not
committed violence against Mother in seven years because he did not like the
looks on the children’s faces when he did it and did not want his children
around it.  Father explained that if there was any arguing or screaming between
him and Mother, the children would cry because they did not want their parents
fighting or arguing.  Father testified that when the children started crying,
he would leave to cool off. 

4.  Compliance
with Service Plan

          Father
testified regarding his compliance with his service plan.  Father admitted that
he had not completed parenting classes due mostly to his job “back then” (when
he was working twelve-hour shifts at the Italian restaurant), as well as due to
being irresponsible and losing his service plan.  Father said that he had
received a new copy of his plan “toward the end of this.”

          Six
days before trial, Father signed up for the Batterers’ Intervention Program.  His
excuses for the delay in starting the Batterers’ Intervention Program were the
same as the ones for not completing the parenting classes.

          Father
testified that he and Mother had completed couples counseling. Father said that
he had been attending individual counseling every Friday during June and that
he had been four times.  Father later admitted that he had no-showed for his
individual counseling on June 24 because he had not gotten enough rest; he had
taken Mother to get “prenatals” after he got off work and did not get home
until 5:00 or 6:00 a.m. and thus could not get up at 8:00 a.m. for counseling. 

          Father
had not started Narcotics Anonymous, nor had he completed the drug and alcohol
evaluation because a referral was needed.  No other urinalyses had been
requested of Father other than the one that was positive on January 25, 2011.  Father
said that he had not started outpatient therapy because he did not have his
service plan.

          Father
said that he had started anger management classes during 2010 and needed one
more class to complete the program.

          Father
attended most of the visits with the children.  Father said that the children
were excited to see him during the visits, that they ran toward him, and that
they said, “[W]e love you, daddy.”

5.  Condition
of Home

          At
the time of the termination trial, Father was living in the same home that he
had been living in for the prior year.  Father said that his home was in better
condition at the time of the termination trial than it was when the children
were removed in July 2010.  He and Mother had repainted, had installed new tile
and new curtains, and had fixed the toilet.  He said that they still had “the
bug problem” and “the test for my children, the lead poisoning.”  Father said
that they had saved up money to hire an exterminator but then had to use that
money to pay another bill.  They then started looking for another place to live
because they thought the best solution was to get “a whole new place and start
fresh.”  Father said that they had been looking for another apartment for about
two months; that they had planned to rent an apartment, but Father’s background
check did not check out; and that they had recently found a duplex that was
only $95 more per month and would not run a background check.  Father did not
think that his current home was appropriate for the children because of the
issues with bugs and lead. 

6. 
Father’s Plan for the Children

          Father
agreed that it was “a fair choice” for CPS to place his children in foster care
based on what was going on in July 2010.  Father said that it was not fair for
his children to keep waiting for him to get his “ducks in a row” because they
did not do anything “to deserve the spot they’re in right now.”  Father
appreciated the care that had been provided to his children while they were in
foster care; he had seen for himself that his children had flourished:  “They’re
different kids and it makes me so happy to see them the way they are.”  Father,
however, wanted the children to live with his parents. 

E. 
CASA Volunteer’s Testimony

          Susan
Myrosh, the CASA volunteer, testified that she went to the family’s house in
the middle of the summer of 2010 and that the refrigerator stood out to her the
most because it was not cold and there were dead bugs and roaches in it.  She
said that there were bugs crawling on the kitchen counter.  She was also
concerned about a battery that was sitting next to the children’s toy box.  She
recalled that the home had been tested for the presence of lead. 

          Myrosh
sat in on the parents’ visits with the children and said that they went well.  Myrosh
testified that the children had “really blossomed” during the year that they
were in foster care.  She said that initially J.C.P. was withdrawn but that at
the time of the termination trial, he willingly told stories and talked to
people.  Myrosh said that he was still difficult to understand but that his
speech had improved with speech therapy.  M.E.S., at the time of the
termination trial, was able to feed herself and was much more open, running up
to give Myrosh hugs.

          Myrosh
recommended terminating Father’s parental rights because “[t]he children
shouldn’t have been as far behind as they were to begin with.”  Myrosh also
based her recommendation on “the fact that if we’re having trouble doing
service plans and doing requirements now to get them back, when I’m just
worried that down the road, their concerns are not going to be a priority.  I
don’t feel it’s their priority now.” 

F. 
Trial Court’s Statements and Findings

          At
the conclusion of the trial, the trial court stated, “[Father], I’m concerned
that you have not made much progress at all in your service plan, and that
concerns me greatly.”  After considering the evidence, the trial court found by
clear and convincing evidence that, after having waived service of process or
being served with citation in the suit, Father did not respond by filing an
admission of paternity or by filing a counterclaim for paternity or for
voluntary paternity to be adjudicated under chapter 160 of the Texas Family
Code before the final hearing; that Father had knowingly placed or knowingly
allowed the children to remain in conditions or surroundings that endangered
the emotional or physical well-being of the children; that Father had engaged
in conduct or knowingly placed the children with persons who engaged in conduct
that endangered the physical or emotional well-being of the children; and that
termination of the parent-child relationship, if any existed or could exist,
between the alleged father and the children is in the children’s best interest.
 This appeal followed.

III.  Error
in Nonpaternity Finding Is Not Reversible

          In
his first issue, Father argues that there is no evidence or insufficient
evidence to support the trial court’s finding that he did not respond by filing
an admission of paternity or by filing a counterclaim for paternity or for
voluntary paternity to be adjudicated under chapter 160 of the Texas Family
Code before the final hearing.[9] 

          The
State concedes error, pointing out that under this court’s precedent, Father’s
admission of paternity in his request for counsel suffices to establish his
paternity.  See In re K.W., 138 S.W.3d 420, 430 (Tex. App.—Fort Worth
2004, pet. denied); see also In re D.K.W., No. 02-09-00369-CV,
2010 WL 3928721, at *2 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem.
op.).  However, as the State also points out, a termination judgment must be
upheld if the evidence supports a best interest finding and a finding on any
ground for termination alleged under section 161.001(1) of the family code.  Father
does not challenge the trial court’s findings on the grounds for termination
alleged under subsections (D) and (E) of section 161.001(1).  See Tex.
Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2011); In re E.M.N.,
221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).  Accordingly, because
the termination judgment must be upheld on these unchallenged grounds for
termination found by the trial court, the trial court’s erroneous finding that
Father had not admitted paternity is not reversible.  See D.K.W., 2010
WL 3928721, at *2.  We therefore overrule Father’s first issue.

IV.  Sufficient Evidence Exists
to Support Best Interest Finding

          In
his second issue, Father argues that there is no evidence or insufficient
evidence to support the trial court’s finding that termination of his parental
rights was in the children’s best interest.

A.  Standards
of Review

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that  termination of the parent-child relationship would be in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001; In re C.H.,
89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed
evidence that a reasonable factfinder could not have credited in favor of the
finding is so significant that a factfinder could not reasonably have formed a
firm belief or conviction in the truth of its finding, then the evidence is
factually insufficient.  H.R.M., 209 S.W.3d at 108.

B.  Best
Interest Factors

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).

The
following factors should be considered in evaluating the parent’s willingness
and ability to provide the child with a safe environment:

(1) the child’s age and physical and mental
vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the
harm to the child;

(4) whether the child has been the victim of repeated
harm after the initial report and intervention by the department or other
agency;

(5) whether the child is fearful of living in or
returning to the child’s home;

(6) the results of psychiatric, psychological, or
developmental evaluations of the child, the child’s parents, other family
members, or others who have access to the child’s home;

(7) whether there is a history of abusive or assaultive
conduct by the child’s family or others who have access to the child’s home;

(8) whether there is a history of substance abuse by the
child’s family or others who have access to the child’s home;

(9) whether the perpetrator of the harm to the child is
identified;

(10) the willingness and ability of the child’s family to
seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency’s close supervision;

(11) the willingness and ability of the child’s family to
effect positive environmental and personal changes within a reasonable period
of time;

(12) whether the child’s family demonstrates adequate
parenting skills, including providing the child and other children under the
family’s care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline
consistent with the child’s physical and psychological development;

(C) guidance and supervision consistent with the child’s
safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even
though the violence may not be directed at the child;  and

(F) an understanding of the child’s needs and
capabilities;  and

(13) whether an adequate social support system consisting
of an extended family and friends is available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116. 

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

 (A)    the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of the
individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home or
proposed placement;

(H)     the acts or omissions of the
parent which may indicate that the existing parent-child relationship is not a
proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

C. 
Analysis

          Here,
Father bases his argument solely on the first Holley factor, arguing
that the descriptions of the visits and the bonding of the children is the best
evidence of the desires of the children.  The record, however, does not
disclose the desires of the children.  Moreover, the remaining Holley
factors do not weigh in favor of Father.  The CPS caseworker did not believe
that Father could provide for the emotional and physical needs of the children.
 Father had not completed the Batterers’ Intervention and Prevention Program or
the bulk of his services, nor had he eliminated the home’s roach infestation,
thus continuing to expose the children to emotional and physical danger.  Father
made excuses for his failure to complete his services, including his employment
and his failure to keep up with his service plan.  Though Father and the
children appeared to be bonded, as noted by the children’s response to Father
at the visits, Father had failed to properly parent and care for the children
as they were dirty and had health issues (M.E.S. had a horrible diaper rash,
while J.C.P. had lead poisoning and was not potty trained at almost four years
old) when they came into care.  Father wanted the children returned to his
parents while he continued to search for a new residence because he recognized
that the current home was not suitable for the children; CPS, however, planned
for the children to be adopted by the foster family that had potty-trained
J.C.P. and had provided the children with stability and an environment that
allowed the children to flourish.

          The
evidence also does not weigh in favor of Father with regard to the section
263.307(b) factors.  The children were ages four and a half and two at the time
of the termination trial; J.C.P. received speech therapy and play therapy,
while M.E.S. was no longer receiving any therapy.  The record, as set forth
above, reveals that the children were present but were “always in another room”
in the one-bedroom duplex when Mother and Father argued and that the children
cried when Mother and Father were fighting.  The children were also exposed to
deplorable conditions in the home, including unsanitary conditions in the
bathroom, cramped conditions in the bedroom, roaches and bugs in the kitchen,
and lead poisoning.

          The
record likewise reveals a history of abusive and assaultive conduct by Father
towards Mother.  Mother testified about an incident in which Father had pushed
her in the chest, an incident in which Father had thrown soup at her, an
incident in which Father had thrown a phone at her and had “busted her lip,”
and the knife incident that had prompted CPS to remove the children.  Although
Mother described the pushing as “play-fighting,” both Mother and Father attempted
to couch the soup incident and the phone incident as “accidents,” and both Mother
and Father tried to minimize the knife incident, the factfinder was free to
interpret the incidents otherwise in light of the number of so-called
“accidents” and the fact that Mother had a bruise on her thigh when the CPS
investigator arrived.  Additionally, Mother admitted that she and Father had a
lot of arguments and that Father had yelled at her a lot, but she said that
they had not recently argued and had no problems at the time of the termination
trial.

          The
record also details a history of substance abuse.  Father had a conviction for
possession of marijuana, admitted using methamphetamine and marijuana, and had
tested positive for marijuana on January 25, 2011.  Father testified that he
had ceased using all drugs after that positive test, but he had not attended
outpatient drug and alcohol treatment groups or any Narcotics Anonymous
meetings.

          Additionally,
the record demonstrated that Father had not completed the bulk of the services
on his service plan.  The trial court specifically stated, “[Father], I’m
concerned that you have not made much progress at all in your service plan, and
that concerns me greatly.”  Father blamed his job and misplacing his service
plan for his failure to complete his services.

          The
record also did not demonstrate that Father had effected positive environmental
and personal changes or that he had adequate parenting skills.  As mentioned
above in the Holley-factor analysis, the house still had a roach
infestation at the time of the trial, the potential for lead poisoning
lingered, Father had not worked his services to show that he had effected
personal change, and Father had not properly cared for his children before they
came into care.  The CPS caseworker did not believe that Father had the ability
to provide a safe and healthy environment for the children.  And though
Father’s support system included his parents, their ability to provide
financial support could not overcome Father’s criminal background, which was a
hindrance to his ability to rent a new duplex.

          Considering
the relevant Holley factors and the relevant statutory factors in
evaluating Father’s willingness and ability to provide the children with a safe
environment, we hold that the evidence is both legally and factually sufficient
to support the trial court’s finding that termination of the parent-child
relationship between Father and the children is in the children’s best
interest.  See In re D.O., 338 S.W.3d 29, 35–37 (Tex. App.—Eastland
2011, no pet.) (holding that evidence was legally and factually sufficient to
support best interest finding because parents used drugs and tested positive
for drugs; father physically abused mother multiple times; children had seen
parents fighting, and it scared them; and children were thriving since being
placed in foster care); In re T.M.J., 315 S.W.3d 271, 278–79 (Tex.
App.—Beaumont 2010, no pet.) (holding that evidence was legally and factually
sufficient to support best interest finding because despite evidence that
mother loved children and had a stable job and stable residence at time of
trial, children were dirty and had heavily soiled diapers when CPS arrived,
father was verbally and sometimes physically abusive, children were thriving in
foster care, and a potential adoptive family existed).  We overrule Father’s
second issue.

V.  Conclusion

          Having
overruled Father’s two issues, we affirm the trial court’s judgment terminating
his parental rights to J.C.P. and M.E.S.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
WALKER,
MCCOY, and GABRIEL, JJ.

 

DELIVERED:  May 3, 2012









[1]See Tex. R. App. P. 47.4.





[2]Mother was twenty at the
time of the termination trial and had been in a relationship with Father since
she was thirteen.





[3]Father did not recall
telling Corretjer that he could not abide by the safety plan. 





[4]Mother and Father said
that the children did not have any medical conditions and denied that M.E.S.
had a diaper rash.





[5]The Department admitted
into evidence a judgment showing that Father had been convicted of possession
of marijuana in 2006 and was sentenced to twenty days’ confinement.





[6]Fernandes said that Father
had last been tested for drugs in January 2011.





[7]Father initially did not
visit with J.C.P. because he did not know whether he was his father.





[8]Mother was sixteen or
seventeen at the time of this incident and had called her mother to pick her up
so that she could separate from Father.  Mother’s mother called the police.





[9]Section 161.002(b) of the
family code allows an alleged father’s parental rights to be summarily
terminated if, among other things, the trial court finds, as it did here, that
“after being served with citation, he does not respond by timely filing an
admission of paternity or a counterclaim for paternity.”  Tex. Fam. Code Ann. §
161.002(b)(1) (West 2008).