

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00289-CV

IN THE INTEREST OF J.C.P. AND
M.E.S., CHILDREN

----------

### FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

In two issues, Appellant Father appeals the trial court's termination of his parental rights to J.C.P. and M.E.S., arguing that there is no evidence or insufficient evidence to support the trial court's finding that he did not respond by filing an admission of paternity and that there is no evidence or insufficient evidence to support the trial court's finding that termination was in the children's best interest. We will affirm.

---

[1]See Tex. R. App. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The children involved in this appeal are J.C.P., a male child who was born on October 19, 2006, and M.E.S., a female child who was born on March 16, 2009. Because only Father has appealed and because he does not challenge the endangerment grounds, the following testimony from the June 27, 2011 termination trial will focus on the evidence relevant to the best interest factors.

### A. CPS Investigator's Testimony

### 1. Domestic Violence and Drug Use

Wanesta Corretjer, an investigator with Child Protective Services (hereinafter referred to as CPS or the Department), testified that a referral was received on July 15, 2010, regarding domestic violence that had occurred two days prior when Father had allegedly lunged at Mother with a kitchen knife and had threatened to kill her. Mother ran out of the house in a t-shirt and panties and reported that she was afraid and that the domestic violence was ongoing.

Due to the report of the knife, Corretjer took the police with her when she went to visit the home on July 19. When Corretjer talked to Mother alone, she did not deny the knife incident but minimized it by stating that Father merely had a knife in his hand. Mother said that the children were safe and that there was no abuse or domestic violence going on in the home. Corretjer noted that Mother had a bruise on her thigh, which she said had occurred when she bumped into a washing machine. Mother did admit that Father had "busted her lip" with a telephone on a prior occasion.

2

When Corretjer interviewed Father by himself, he said that he understood how Mother could have been intimidated by the knife but that it was not his intention to scare her; he just picked it up during the argument. Father said that he was arguing with Mother over her not cleaning the home. Father denied hitting Mother any time recently, but he admitted that he had "smacked" her when she was a teenager because she had allegedly cheated on him.[2] Father also admitted that he had used marijuana since he was a teenager and had used it the day before Corretjer interviewed him, said that he had used methamphetamine the Friday before Corretjer interviewed him, but denied that he had used it around the children. Father told Corretjer that he could not promise to abide by a safety plan.[3]

## 2. Condition of Children

Corretjer testified that M.E.S. had one of the worst diaper rashes that Corretjer had ever seen.[4] Corretjer noted that M.E.S.'s feet were dirty, that she came outside wearing only a diaper, and that the parents never tried to get her to go back inside. J.C.P. had discolored teeth, a dirty face, dirty fingernails, dirty feet, and dirty toenails. He was still wearing a diaper at age four, and his diaper

---

[2]Mother was twenty at the time of the termination trial and had been in a relationship with Father since she was thirteen.

[3]Father did not recall telling Corretjer that he could not abide by the safety plan.

[4]Mother and Father said that the children did not have any medical conditions and denied that M.E.S. had a diaper rash.

was soaked with urine.  After J.C.P.'s feet were cleaned, unexplained marks were noticeable.  Both children had what appeared to be insect bite marks on them.

### 3.  Condition of Home

Corretjer described the home as unsanitary and filthy.  The one bedroom in the duplex had two twin beds in it, one of which was bare, and the other had a blanket on it.  The bed that had no bedding on it had old food on it.  Corretjer recalled seeing a crib that was piled with toys and that had a bottle with old formula in it; there were roaches crawling on the bottle.  The high chair was very dirty, had a roach in it, and contained old food and unknown substances.  The one bathroom in the duplex had a toilet that was filled with feces and was not flushable, a "very filthy" tub that had a film around the inside and along the walls, a dirty sink, and dead roaches on the walls.  A water hose was strung across the dining room and kitchen, but Corretjer did not know what it was being used for.  The kitchen walls were dirty and had dead roaches on them.  The family had adequate groceries in the refrigerator, but the refrigerator was not clean.  Mother and Father said that they made their own cigarettes, and there was a photograph depicting their tobacco.

### 4.  Removal of Children

The parents were not able to agree on a relative placement for the children, so Corretjer took the children and placed them with a foster family.

## B. CPS Caseworker's Testimony

Tashani Fernandes, a caseworker with CPS, testified that she had first contacted Father in December 2010. At that time, Father had already received a service plan from a previous caseworker.

### 1. Father's Compliance with Service Plan

Father's service plan required him to complete a psychological evaluation, which he had completed; to complete parent training, which he had not completed or initiated; to complete anger management, which he had completed; to complete the Batterers' Intervention and Prevention Program, which he was slated to start with Safe Haven the month after the trial because Merit Family Services—the initial provider—was never able to get in contact with him; to complete individual counseling, which he had started but had not completed; to complete couples counseling, which he had started but had not completed; to complete a drug and alcohol assessment, which he had not completed; to attend outpatient drug and alcohol treatment groups, which he had not completed; to attend Narcotics Anonymous meetings, which he had not completed;[5] and to participate in random drug testing, for which he had submitted a urinalysis on January 25, 2011, that tested positive for marijuana.[6] Father attended the visits,[7]

---

[5]The Department admitted into evidence a judgment showing that Father had been convicted of possession of marijuana in 2006 and was sentenced to twenty days' confinement.

[6]Fernandes said that Father had last been tested for drugs in January 2011.

was appropriate with the children, and seemed to have a relationship with them. Fernandes testified that Father, who was the sole wage-earner in the family, had told her that the services interfered with his job, and Fernandes told Father to speak to the service providers and that they would accommodate his work schedule.

## 2. Condition of Home

Fernandes made an unannounced visit to the home on December 17, 2010, and she found dead roaches all over the inside of the refrigerator doors and on the back of the refrigerator; there were small bugs crawling on the kitchen counters; there were three beds in the sole bedroom; the bathroom was "really dirty" and had a broken window; the window in the back door was broken; and there were holes in the wall that looked like someone had punched the wall. Fernandes testified that there were concerns that J.C.P. had been exposed to lead poisoning, and Fernandes talked to the parents about eliminating that issue. The parents did not indicate that they had taken any action or done anything to the house to eliminate the possibility of lead poisoning.

## 3. Condition of Children at Termination Trial

J.C.P. was thriving in his foster home. His foster parents were able to get him potty-trained the month before the termination trial, he attended play therapy weekly, his speech had improved, and he had gone from very quiet to very

[7]Father initially did not visit with J.C.P. because he did not know whether he was his father.

talkative and outgoing. M.E.S. had received occupational therapy and speech therapy when she first came into care, but she was no longer receiving any therapy. Neither child had any medical conditions.

### 4. CPS Requests Termination of Parental Rights

Fernandes did not believe that Father could provide for the emotional and physical needs of the children. Fernandes also did not believe that Father had the ability to provide a safe and healthy environment for the children. Fernandes believed that it was in the children's best interest for Father's parental rights to be terminated based on (1) the history of domestic violence, (2) Father's failure to address the domestic violence issues, and (3) the conditions of the home. Fernandes testified that the foster parents were interested in adopting the children.

### C. Mother's Testimony

### 1. Father's Criminal History and Drug Use

Mother said that Father had told her that he had been accused of rape in the past, but the case was dismissed because of no evidence. Mother said that Father used marijuana occasionally.

### 2. Domestic Violence

Mother testified that Father had been violent toward her once "[y]ears ago" before she had children. Initially, Mother testified that she could not recall what had happened, but later she testified that Father had pushed her in the chest

because they were "play-fighting." Mother said that she got mad and that they separated for a couple of hours.

Mother testified that Father had also accidentally hit her with a telephone. He threw the phone, and she was supposed to catch it, but it hit her in the face.

Mother testified that the police had been to her residence twice before the children went into foster care. The police came in 2008 in response to her mother's phone call that Father had spilled soup on Mother during an argument.[8] Mother thought it was an accident but was not sure. Mother agreed that she and Father had a lot of accidents.

The second incident was the knife incident on July 13, 2010. Mother initially testified that she did not know why Father had a knife in his hand that day; "[h]e just picked it up." Mother later admitted that she had said during her psychological evaluation that Father was going to use the knife to cut his marijuana. Mother also admitted that she had been drinking alcohol and orange juice that day, that she was tipsy, and that the children were asleep in the other room when the knife incident occurred. Mother testified that her mother had forced her to write a false statement for the police that Father had chased her with the knife, but she said that he had only pulled the knife on her.

---

[8]Mother was sixteen or seventeen at the time of this incident and had called her mother to pick her up so that she could separate from Father. Mother's mother called the police.

Mother admitted that she and Father had a lot of arguments, including ones that involved cursing, and that Father had yelled at her a lot. Mother said that the children were always in another room during the arguments and that she did not think they yelled loud enough for the children to hear. Mother said that no arguing or yelling had happened recently; therefore, she did not think that Father needed some type of domestic violence or batterers' intervention program.

### 3. Condition of Children

Mother testified that both children had a skin condition that caused their skin to flake and turn into rashes. Mother said that M.E.S. "had just gotten" the diaper rash when she was removed and that Mother had a lotion for it.

Mother did not know until J.C.P. went into foster care that he had lead poisoning. Mother testified that they had purchased a lead test kit, that her dad had conducted the test, and that there was no lead in the home. Mother believed that J.C.P.'s lead poisoning was from a toy that had been recalled in 2007.

### D. Father's Testimony

### 1. Employment

Father testified that at the time of the termination trial, he was employed with Accurate Metal Stamping; that he worked forty hours per week, Monday through Thursday from 3:30 p.m. until 2:00 a.m.; that he made $9 an hour; and that he had been employed at that job since December 2010 or January 2011. Father was previously employed with Big Joe's, an Italian restaurant, where he had worked seventy-two hours per week for two years. While he worked there

from 10:00 a.m. to 10:00 p.m., he said that it was "really difficult" to attend the classes required under his service plan and that he was terminated from the job in November 2010 after he missed a day of work to undergo his psychological evaluation.

## 2.  Criminal History and Drug Use

Father testified that the charges from the July 2010 incident were dropped. Thus, his only conviction was a 2006 conviction for possession of marijuana.

Father testified that he had last used methamphetamine two days before his children were removed.  He had used methamphetamine more than just that time but did not say how often he had used it; he testified that marijuana was his drug of choice.  Father said that the allegations that he smoked marijuana every day were not true.  Father stopped using all drugs after he tested positive for marijuana in late January 2011.

Father thought that he was "perfectly fine" and did not need drug treatment at the time of the termination trial but said that he probably had needed it in the past.  Father agreed that people who smoke dope do not need to be parenting their children and that he had smoked marijuana and had attempted to parent his children.  Father testified that he had "quit everything" and was "trying to continue to do right."  Father agreed that, "[i]n a way," he had not done right.

## 3.  Domestic Violence

Father admitted that he had picked up a knife during the argument with Mother in July 2010, but he said that he did not pull it on Mother.  He said that he

10

was using a lot of marijuana at the time, that he was thinking like a drug addict, and that he had picked up a knife to make a cigarette. Father admitted that there was a protective order in place after he went to jail for the knife incident.

Father thought that the soup incident was an accident because he did not recall being angry and throwing soup at Mother. He thought that "the information got mixed up and made bigger."

Father testified that the incident in which Mother was hit by the phone occurred because Mother had slipped, and the side of the phone had hit her face; he was not throwing the phone at her to hit her but rather he had intended for her to catch it.

Father admitted that he had committed violence against Mother when he first met her because he "used to have a different mentality." Father said that he had not committed violence against Mother in seven years because he did not like the looks on the children's faces when he did it and did not want his children around it. Father explained that if there was any arguing or screaming between him and Mother, the children would cry because they did not want their parents fighting or arguing. Father testified that when the children started crying, he would leave to cool off.

### 4. Compliance with Service Plan

Father testified regarding his compliance with his service plan. Father admitted that he had not completed parenting classes due mostly to his job "back then" (when he was working twelve-hour shifts at the Italian restaurant), as well

as due to being irresponsible and losing his service plan. Father said that he had received a new copy of his plan "toward the end of this."

Six days before trial, Father signed up for the Batterers' Intervention Program. His excuses for the delay in starting the Batterers' Intervention Program were the same as the ones for not completing the parenting classes.

Father testified that he and Mother had completed couples counseling. Father said that he had been attending individual counseling every Friday during June and that he had been four times. Father later admitted that he had no-showed for his individual counseling on June 24 because he had not gotten enough rest; he had taken Mother to get "prenatals" after he got off work and did not get home until 5:00 or 6:00 a.m. and thus could not get up at 8:00 a.m. for counseling.

Father had not started Narcotics Anonymous, nor had he completed the drug and alcohol evaluation because a referral was needed. No other urinalyses had been requested of Father other than the one that was positive on January 25, 2011. Father said that he had not started outpatient therapy because he did not have his service plan.

Father said that he had started anger management classes during 2010 and needed one more class to complete the program.

Father attended most of the visits with the children. Father said that the children were excited to see him during the visits, that they ran toward him, and that they said, "[W]e love you, daddy."

## 5. Condition of Home

At the time of the termination trial, Father was living in the same home that he had been living in for the prior year. Father said that his home was in better condition at the time of the termination trial than it was when the children were removed in July 2010. He and Mother had repainted, had installed new tile and new curtains, and had fixed the toilet. He said that they still had "the bug problem" and "the test for my children, the lead poisoning." Father said that they had saved up money to hire an exterminator but then had to use that money to pay another bill. They then started looking for another place to live because they thought the best solution was to get "a whole new place and start fresh." Father said that they had been looking for another apartment for about two months; that they had planned to rent an apartment, but Father's background check did not check out; and that they had recently found a duplex that was only $95 more per month and would not run a background check. Father did not think that his current home was appropriate for the children because of the issues with bugs and lead.

## 6. Father's Plan for the Children

Father agreed that it was "a fair choice" for CPS to place his children in foster care based on what was going on in July 2010. Father said that it was not fair for his children to keep waiting for him to get his "ducks in a row" because they did not do anything "to deserve the spot they're in right now." Father appreciated the care that had been provided to his children while they were in

foster care; he had seen for himself that his children had flourished: "They're different kids and it makes me so happy to see them the way they are." Father, however, wanted the children to live with his parents.

### E. CASA Volunteer's Testimony

Susan Myrosh, the CASA volunteer, testified that she went to the family's house in the middle of the summer of 2010 and that the refrigerator stood out to her the most because it was not cold and there were dead bugs and roaches in it. She said that there were bugs crawling on the kitchen counter. She was also concerned about a battery that was sitting next to the children's toy box. She recalled that the home had been tested for the presence of lead.

Myrosh sat in on the parents' visits with the children and said that they went well. Myrosh testified that the children had "really blossomed" during the year that they were in foster care. She said that initially J.C.P. was withdrawn but that at the time of the termination trial, he willingly told stories and talked to people. Myrosh said that he was still difficult to understand but that his speech had improved with speech therapy. M.E.S., at the time of the termination trial, was able to feed herself and was much more open, running up to give Myrosh hugs.

Myrosh recommended terminating Father's parental rights because "[t]he children shouldn't have been as far behind as they were to begin with." Myrosh also based her recommendation on "the fact that if we're having trouble doing service plans and doing requirements now to get them back, when I'm just

worried that down the road, their concerns are not going to be a priority. I don't feel it's their priority now."

## F. Trial Court's Statements and Findings

At the conclusion of the trial, the trial court stated, "[Father], I'm concerned that you have not made much progress at all in your service plan, and that concerns me greatly." After considering the evidence, the trial court found by clear and convincing evidence that, after having waived service of process or being served with citation in the suit, Father did not respond by filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing; that Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the emotional or physical well-being of the children; that Father had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children; and that termination of the parent-child relationship, if any existed or could exist, between the alleged father and the children is in the children's best interest. This appeal followed.

## III. ERROR IN NONPATERNITY FINDING IS NOT REVERSIBLE

In his first issue, Father argues that there is no evidence or insufficient evidence to support the trial court's finding that he did not respond by filing an admission of paternity or by filing a counterclaim for paternity or for voluntary

15

paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing.[9]

The State concedes error, pointing out that under this court's precedent, Father's admission of paternity in his request for counsel suffices to establish his paternity. *See In re K.W.*, 138 S.W.3d 420, 430 (Tex. App.—Fort Worth 2004, pet. denied); *see also In re D.K.W.*, No. 02-09-00369-CV, 2010 WL 3928721, at *2 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem. op.). However, as the State also points out, a termination judgment must be upheld if the evidence supports a best interest finding and a finding on any ground for termination alleged under section 161.001(1) of the family code. Father does not challenge the trial court's findings on the grounds for termination alleged under subsections (D) and (E) of section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2011); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Accordingly, because the termination judgment must be upheld on these unchallenged grounds for termination found by the trial court, the trial court's erroneous finding that Father had not admitted paternity is not reversible. *See D.K.W.*, 2010 WL 3928721, at *2. We therefore overrule Father's first issue.

---

[9]Section 161.002(b) of the family code allows an alleged father's parental rights to be summarily terminated if, among other things, the trial court finds, as it did here, that "after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity." Tex. Fam. Code Ann. § 161.002(b)(1) (West 2008).

16

## IV. SUFFICIENT EVIDENCE EXISTS TO SUPPORT BEST INTEREST FINDING

In his second issue, Father argues that there is no evidence or insufficient evidence to support the trial court's finding that termination of his parental rights was in the children's best interest.

### A. Standards of Review

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### B. Best Interest Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

18

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and
>
> (F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)   any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Analysis

Here, Father bases his argument solely on the first *Holley* factor, arguing that the descriptions of the visits and the bonding of the children is the best evidence of the desires of the children. The record, however, does not disclose the desires of the children. Moreover, the remaining *Holley* factors do not weigh in favor of Father. The CPS caseworker did not believe that Father could provide for the emotional and physical needs of the children. Father had not completed the Batterers' Intervention and Prevention Program or the bulk of his services, nor had he eliminated the home's roach infestation, thus continuing to expose the children to emotional and physical danger. Father made excuses for his failure to complete his services, including his employment and his failure to keep up with his service plan. Though Father and the children appeared to be bonded, as noted by the children's response to Father at the visits, Father had failed to properly parent and care for the children as they were dirty and had health issues (M.E.S. had a horrible diaper rash, while J.C.P. had lead poisoning and was not potty trained at almost four years old) when they came into care. Father wanted the children returned to his parents while he continued to search for a new residence because he recognized that the current home was not suitable for the children; CPS, however, planned for the children to be adopted by the foster family that had potty-trained J.C.P. and had provided the children with stability and an environment that allowed the children to flourish.

21

The evidence also does not weigh in favor of Father with regard to the section 263.307(b) factors. The children were ages four and a half and two at the time of the termination trial; J.C.P. received speech therapy and play therapy, while M.E.S. was no longer receiving any therapy. The record, as set forth above, reveals that the children were present but were "always in another room" in the one-bedroom duplex when Mother and Father argued and that the children cried when Mother and Father were fighting. The children were also exposed to deplorable conditions in the home, including unsanitary conditions in the bathroom, cramped conditions in the bedroom, roaches and bugs in the kitchen, and lead poisoning.

The record likewise reveals a history of abusive and assaultive conduct by Father towards Mother. Mother testified about an incident in which Father had pushed her in the chest, an incident in which Father had thrown soup at her, an incident in which Father had thrown a phone at her and had "busted her lip," and the knife incident that had prompted CPS to remove the children. Although Mother described the pushing as "play-fighting," both Mother and Father attempted to couch the soup incident and the phone incident as "accidents," and both Mother and Father tried to minimize the knife incident, the factfinder was free to interpret the incidents otherwise in light of the number of so-called "accidents" and the fact that Mother had a bruise on her thigh when the CPS investigator arrived. Additionally, Mother admitted that she and Father had a lot

of arguments and that Father had yelled at her a lot, but she said that they had not recently argued and had no problems at the time of the termination trial.

The record also details a history of substance abuse. Father had a conviction for possession of marijuana, admitted using methamphetamine and marijuana, and had tested positive for marijuana on January 25, 2011. Father testified that he had ceased using all drugs after that positive test, but he had not attended outpatient drug and alcohol treatment groups or any Narcotics Anonymous meetings.

Additionally, the record demonstrated that Father had not completed the bulk of the services on his service plan. The trial court specifically stated, "[Father], I'm concerned that you have not made much progress at all in your service plan, and that concerns me greatly." Father blamed his job and misplacing his service plan for his failure to complete his services.

The record also did not demonstrate that Father had effected positive environmental and personal changes or that he had adequate parenting skills. As mentioned above in the *Holley*-factor analysis, the house still had a roach infestation at the time of the trial, the potential for lead poisoning lingered, Father had not worked his services to show that he had effected personal change, and Father had not properly cared for his children before they came into care. The CPS caseworker did not believe that Father had the ability to provide a safe and healthy environment for the children. And though Father's support system included his parents, their ability to provide financial support could not overcome

Father's criminal background, which was a hindrance to his ability to rent a new duplex.

Considering the relevant *Holley* factors and the relevant statutory factors in evaluating Father's willingness and ability to provide the children with a safe environment, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship between Father and the children is in the children's best interest. *See In re D.O.*, 338 S.W.3d 29, 35–37 (Tex. App.—Eastland 2011, no pet.) (holding that evidence was legally and factually sufficient to support best interest finding because parents used drugs and tested positive for drugs; father physically abused mother multiple times; children had seen parents fighting, and it scared them; and children were thriving since being placed in foster care); *In re T.M.J.*, 315 S.W.3d 271, 278–79 (Tex. App.—Beaumont 2010, no pet.) (holding that evidence was legally and factually sufficient to support best interest finding because despite evidence that mother loved children and had a stable job and stable residence at time of trial, children were dirty and had heavily soiled diapers when CPS arrived, father was verbally and sometimes physically abusive, children were thriving in foster care, and a potential adoptive family existed). We overrule Father's second issue.

## V. Conclusion

Having overruled Father's two issues, we affirm the trial court's judgment terminating his parental rights to J.C.P. and M.E.S.

SUE WALKER
JUSTICE

PANEL: WALKER, MCCOY, and GABRIEL, JJ.

DELIVERED: May 3, 2012

25